# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

THEODORE CHURCHILL SHOVE III,
Defendant and Appellant.

S161909

Los Angeles County Superior Court
BA271293

August 13, 2026

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Groban, and Earl* concurred.

Justice Evans filed a dissenting opinion, in which Justice Liu concurred.

---

\*    Administrative Presiding Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. SHOVE
S161909

Opinion of the Court by Kruger, J.

A jury convicted defendant Theodore Churchill Shove III of the first degree murders of Hubert and Elizabeth Souther. (Pen. Code, § 187, subd. (a).) The jury also found Shove guilty of second degree commercial burglary (Pen. Code, § 459), receiving stolen property (Pen. Code, § 496, subd. (a)), and three counts of sending a threatening letter for extortion (Pen. Code, § 523). The jury found true multiple murder (Pen. Code, § 190.2, subd. (a)(3)) and murder-for-financial-gain (Pen. Code, § 190.2, subd. (a)(1)) special-circumstance allegations. At the penalty phase, the jury fixed the punishment at death. The trial court denied Shove's motion for a new trial and automatic motion to modify the death verdict and entered a judgment of death.

This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

The prosecution presented evidence that Shove masterminded a murder, burglary, and extortion scheme in a ploy to obtain a business owned and operated by the Souther family. The scheme included hiring a friend to kill Hubert and Elizabeth Souther, thereby transferring control of the business to the couple's adult children; burglarizing the business's safe; and then, under a false identity, attempting to extort money from the children.

1

## A. Guilt Phase

### 1. Prosecution Case

#### a. The Souther Family and Cal Aero

Hubert Souther founded Cal Aero, an aerospace surplus hardware business, in 1975. At the time of their killing in 2001, Hubert and his wife, Elizabeth,[1] were 79 and 81 years old, respectively.

The Southers' daughters, Collette Kingsley and Allison Renck, each owned a 26 percent interest in Cal Aero, held company titles, and received regular paychecks. Collette's husband, Christopher Kingsley, was a manager at Cal Aero. Allison and her husband, Kenneth Renck, had operated a satellite Cal Aero store in Murrieta.

William Vann was Cal Aero's president. Hubert kept large sums of cash, valuables, and important documents in a safe located in Cal Aero's lunchroom area and would sometimes give Vann up to $25,000 from that safe to buy merchandise for the business at auction.

#### b. The plan to purchase Cal Aero

Stanley Steves was the owner of a salvage business, Industrial Salvage. Steves met Shove in 1984 and they remained friends over the years; in 2000, Shove began assisting Steves with matters at Industrial Salvage, although Shove was never employed by or on the payroll of, nor did he hold a title at, Industrial Salvage. Approximately six months before the Southers' murder, Shove began expressing to Steves an interest in purchasing Cal Aero.

---

[1] For clarity, persons sharing the same surname will be referred to by their first names.

Steves knew both Hubert and Vann.  In 1984, Steves met Hubert and the two maintained a business and social relationship until Hubert's murder.  Steves and Vann had known each other for about 10 years through their respective business dealings.  In 2000 or 2001, Steves introduced Shove to Vann.  Shove immediately and frequently thereafter expressed interest in buying Cal Aero and it became a topic of conversation every time Shove and Vann spoke.  Shove spearheaded efforts to purchase the business and asked Steves to be his partner.  When Vann asked how he would get the money to buy Cal Aero, Shove told Vann that money was not an issue, and that Shove could get money from the "mafia" to purchase Cal Aero.

Shove, Steves, and Vann were all acquainted with Jack Reiland and Monte Proulx, who were principals of Deft Kemp, a company that did business similar to Cal Aero.  The five men met multiple times to discuss the possibility of forming a company to purchase Cal Aero.  Vann testified that Shove "became more obsessed" with purchasing Cal Aero over time.  Just before the murders, Shove would call Vann almost every day and express his desire to obtain the company.

Witnesses testified that Shove was both persuasive and intimidating.  As discussed below (see pt. II.D, *post*), Shove would regularly use the alias "Tony Bonanno" and reference his purported connections to the mafia, though there was no evidence that Shove was connected to organized crime.  Vann testified that when Shove referred to Monte Proulx, Shove would reference "Monte's Army," which Shove claimed was a group of Mexican nationals who would perform clandestine operations in the United States using "night scopes" and "high-caliber weapons."  Shove told Vann "that they were his enforcers

and that they would take care of any kind of problems or people or jobs he needed done."

Testimony differed over whether Hubert was interested in selling Cal Aero. Both Collette, one of the Southers' daughters, and B.G., the Southers' attorney, denied that Hubert had expressed any intent to sell the business, while Steves and Vann testified that Hubert was entertaining the thought. Shove told Vann that it would not be a problem if Hubert would not sell Cal Aero because Shove already had a deal with Allison and Kenneth, the Southers' other daughter and her husband, who Shove knew to be major shareholders.

Allison's and Kenneth's daughter testified that about one week before her grandparents were murdered she answered a call on the house phone at around 5:00 p.m. from a person who identified himself as "Mike Powers." The man stated that he wanted to speak to Allison about buying Hubert's business. Records established that Shove called the Renck residence's land line telephone at 5:49 p.m. and 7:01 p.m. on September 9, and twice again on the afternoon of September 13. The Rencks' daughter testified that her mother did not return the call because "it was just kind of ridiculous because we knew my grandpa wouldn't sell the business."

c. *The Southers' murders*

On Monday, September 17, 2001, Hubert and Elizabeth were discovered bludgeoned to death in their bed. Evidence indicated that Shove's friend, Lewis Hardin, was the killer.[2]

---

[2] Hardin was jointly tried with Shove and also convicted of the murders, and the jury found true the murder-for-financial-gain and multiple-murder special-circumstance allegations.

Shove and Hardin met in 2000 or 2001. Hardin socialized at Shove's house and sold him cocaine. Hardin's girlfriend testified that Hardin did not have a regular job in 2001; Hardin told her he had a job with Shove but did not explain further.

About one week before the murders, the Southers' home was broken into through the side kitchen door's window and money was stolen from Hubert's pants. The house had an operable alarm system, and the Southers' daughters urged their parents to set it, but they generally would not because of their cats. The Southers did not report the incident to the police.

Vann testified that a week before the murders, Shove told him that he had participated in what Shove called a "dry run"; Shove related that he and somebody else had burglarized Hubert's house through the side door to "send a message to the old man." Shove stated they had parked on the street above the house and Shove waited in the car while his unnamed accomplice went through a neighbor's backyard and into the side of the house. Shove told Vann, "[T]hat should be enough to have [Hubert] sell the business to [Shove]."

The Southers were last seen alive at their home at approximately 4:30 p.m. on Saturday, September 15, 2001. On the morning of Monday, September 17, Shove called Vann several times and told him to "expect some good news." Concern arose when Hubert did not show up to Cal Aero that morning and calls to the Souther residence went unanswered. Collette went to the house to check on her parents and noticed that the glass on the side kitchen door was broken and the door was ajar. Collette entered the house, called out for her parents, and

_____

(Pen. Code, § 190.2, subd. (a)(1), (3).) At the penalty phase, the jury fixed Hardin's punishment at life in prison without the possibility of parole.

discovered them lying on their bed, covered in blood. Collette immediately knew they were dead.

The side kitchen door had pry marks and appeared to be the entry point. There was blood on and around the door, and a trail of blood went from the door out towards the rear of the property, along the pool, and to a back wall, where a bloody handprint and other bloodstains were discovered. The other side of the wall was an ivy-covered slope abutting the street that appeared to have been walked through. The phone line had been disconnected at the phone box located on the back of the house. No valuables were taken from the residence.

Testing revealed that Hardin's DNA matched blood samples taken from the kitchen and living room floors, outside the kitchen door, and the backyard. None of the blood samples from the scene matched anyone other than Hardin or the Southers. Hardin's girlfriend testified that Hardin left for a few days sometime between September 11 and the end of the month, and when she saw him again, he had a deep cut on the palm of his right hand; Hardin refused to seek medical attention. Hardin told his girlfriend it was none of her business, to forget what she saw, and to make sure nobody was following her. When Hardin was arrested for the murders three years later, scarring was observed on his right palm.

The Southers had sustained blunt force injuries, including skull fractures and multiple lacerations and abrasions to the head and face, consistent with having been struck with a tire iron, an impression of which was found on the bedspread. Hubert had potential defensive injuries to his hands. Hubert's cause of death was blunt force trauma to the head; Elizabeth's cause of death was the combined effect of blunt force trauma to the head and asphyxiation by smothering. It could not be

determined whether there was more than one perpetrator or weapon. The medical examiner estimated that the Southers died sometime between 10:00 p.m. on Saturday, September 15, and 2:00 a.m. on Sunday, September 16. The Saturday newspaper was disassembled on the back patio counter, but the Sunday and Monday newspapers were undisturbed on the driveway.

Phone records reflected numerous calls between Hardin and Shove on September 14 through 16. Shove called Hardin eight times throughout the day on the Friday before the murders. Between 3:16 p.m. and 9:16 p.m. on Saturday, September 15, Shove placed six calls to Hardin's residence. There were no calls between the two for almost three hours thereafter until midnight, when Hardin called Shove from his cell phone seven times between 12:00 a.m. and 1:33 a.m. on Sunday. Hardin also used his cell phone to call his home at 1:41 a.m. and 4:21 a.m. Hardin again called Shove from his cell phone at 4:24 a.m., and from 7:12 a.m. to 11:54 p.m., Shove and Hardin called each other 19 times throughout the day.

Shove indicated to Vann that he was involved in the murders, stating that "they" did the "dry run" the same way they did the murders, though Shove never named who else was involved. Shove told Vann that he parked his car above the Souther residence but did not go inside. Shove did not express any remorse and told Vann that "the old man . . . deserved it."

Sometime after Hardin's girlfriend saw the cut on his hand, she overheard Hardin talking to Shove on the telephone; Hardin was upset and asking when he was going to be paid. In October, Hardin's girlfriend overheard an argument at their apartment during which Hardin asked Shove about money and Shove said "not yet" because he "had to go" or "had to send"

somebody to "clean your fucking mess." Sometime after the murders, Shove's wife heard a voicemail message Hardin left on Shove's phone "demand[ing] his money" and threatening "to go to the sheriff and tell them what he knew" if he did not get it. Also after the murders, Shove's daughter listened in on a phone call between Shove, Hardin, and someone Hardin identified as his cousin who said, "we had a deal" and "you're constantly late with your end of it." Shove responded, "you better remember who you're talking to," and "if I said it's going to be there, it's going to be there." On two occasions after the murders, Shove's daughter delivered sealed envelopes to Hardin at her father's request.

### d. Cal Aero safe burglary

The day after the victims' bodies were discovered, the safe in the Cal Aero lunchroom was burglarized.

During the month preceding the murders, Shove asked Vann information about the Cal Aero safe and expressed his belief that there was gold stored inside. Vann provided the name and "probably" the serial number of the safe and told Shove that he believed it contained $100,000 and jewelry. Vann testified that Shove called him five or six times the day the murders were discovered and told Vann that night would be the best time to break into the safe "before the kids could get into it." Phone records established that Shove called Vann numerous times throughout that day. Vann told Shove that he had other commitments and that the Southers had been murdered, to which Shove had "no reaction at all."

On Tuesday, September 18, Collette, Allison, and their spouses went to Cal Aero and inventoried the items in the safe. Both daughters had the combination. They removed Hubert's coin collection, $1,900 in cash, and some other personal

8

property, while important documents were returned to the safe. That day, Shove again called Vann insisting they break into the safe that night. Vann met Shove, Steves, and Proulx at a restaurant and explained that the Souther children had already emptied the safe, but Shove stated, " 'there's no way they could have got all of it,' " and that he was " 'after something else that's in there.' " Vann was ultimately persuaded to participate in the burglary. Steves testified it was discussed that Vann would assist Shove and Proulx in getting into Cal Aero, and Steves excused himself from the conversation because he did not want to be involved.

Vann, Shove, and Proulx arrived at Cal Aero at approximately 5:15 p.m. that night. Shove opened the back door with a key and Vann helped carry some equipment inside before leaving; Vann did not know why Shove had a key to Cal Aero. Vann later returned and helped Shove and Proulx carry out tools; Shove told Vann the safe was empty except for some papers. Steves also testified that Shove told him that they had burglarized the safe, but it was empty. The next day, the safe was discovered empty; the bottom of the safe had been cut and all documents left in the safe, including Elizabeth's will, were missing.

### e. Extortion plot

A few days after the murders, Shove called the Southers' attorney, B.G., and said that he had been negotiating with Hubert about purchasing the business and that he would like to continue doing so. B.G. told Shove that he knew nothing about that but to submit something in writing at the appropriate time and B.G. would present it to the Souther daughters. A few days later, B.G. received a proposal in the mail to purchase Cal Aero for $4 million. The letter had Industrial Salvage's return

address, was signed by Shove, and stated that Steves of Industrial Salvage and Reiland of Deft Kemp had been discussing the terms of a sale with Hubert, and that they still wished to proceed with their offer. Steves testified that this was not a true statement and that he had not authorized Shove to send the letter. On October 4, B.G. spoke to Shove on the telephone, who stated that he was prepared to offer $5 million, but B.G. told Shove he believed Cal Aero to be worth at least $6.5 to $7 million.

Shove expressed his intent to continue pursuing the purchase of Cal Aero, telling Vann "that he had $100,000 invested in this at this point and that he wasn't going to let it go." Shove told Vann that Shove "was going to have something on [Kenneth]" and would have his wife "Allison over a barrel and that she would sell it to him or do anything that he wanted her to do."

About a week after the murders, Shove called Vann and told him "to watch for the mail" and to report back on any reaction of Christopher, Collette's husband. On September 24, Christopher received a letter at Cal Aero addressed to "Kenny, Owner, Cal Aero," which read: "Kenny [¶] You hired me. You gave me my first money. I did the first job. You know I did the job. I did the second job but my owed money wasn't there. [¶] This is proof I did the second job. Your guy didnt get the key to me til after midnight an still I got the job done. [¶] Leave a message at the springs number. [¶] Pay me my money." Enclosed with the letter was the first page of Elizabeth's will. Vann told Shove he observed Christoper run upstairs with a piece of mail; Shove told Vann that he sent the mail "to extort the family into selling [Shove] the business."

Shove owned a white Toyota 4Runner, and his wife testified that they let Proulx borrow it sometime in 2001 and that it was sometimes kept at Industrial Salvage. On October 9, a neighbor who shared a property line with the Rencks observed a white SUV drive into her driveway and spoke with the sole occupant, who identified himself as "Mike Powers" and stated that he was interested in real estate in the area. The neighbor later identified this man as Proulx from a photo lineup. The neighbor allowed Proulx to drive to the top of the property where there was a view of the area. Around 10:00 a.m. the next day, the neighbor again observed Proulx driving the SUV, the two spoke again, and Proulx again drove to the top of the property where he remained for about 20 minutes.

On October 10, Allison and Kenneth went to Cal Aero to meet with B.G. and the company's accountant; B.G. discussed Shove's offer letter. While the Rencks were at this meeting, Kenneth's mother went to the Renck residence and observed a white 4Runner backed up to the Rencks' open garage door. She noted the vehicle's license plate number, which matched Shove's vehicle.[3] Kenneth's mother spoke with a man walking out of the garage who identified himself as "Mike Powers" and said he had a meeting with Kenneth at 2:00 p.m. about exchanging unregistered firearms. She later identified Reiland, Proulx's coprincipal at Deft Kemp, from a photo lineup as the person most resembling the man she saw that day. She did not recognize Shove's or Proulx's photographs at trial. After the man left, Kenneth's mother reported the incident to Kenneth and the police.

---

[3]     A few days before the murders, another of the Rencks' neighbors observed a white Toyota 4Runner with the same license plate number in front of the Rencks' driveway.

11

Kenneth went home and met with police; though there were no signs of forced entry, they discovered footprints by the fence line at the back of the property. While police were still at the house, Kenneth received a call from a man who identified himself as "Mike Powers" and said that Hubert had hired his boss "to find out who was trying to murder him," and that his boss had the killer in custody and did not like the way he had been paid. The caller also told Kenneth that he had evidence linking Kenneth to the murder, which the caller would sell to Kenneth for $300,000. Kenneth's mother had answered the phone and testified that the caller's voice sounded like that of the man she had encountered earlier.

Vann testified that he was with Shove when Shove received a phone call from Proulx, who said Kenneth's mother had seen him inside the Rencks' garage. Shove told Vann that Proulx went to the Renck residence to get what had been removed from the safe but did not find anything. Vann overheard Shove say to Proulx: "[Y]ou stupid son-of-a-bitch. Why did you drive my truck?" Shove told Vann that he would have to report his truck stolen or have it taken to Mexico, and that Vann would be his alibi. Shove also told Vann that Shove was going to put more pressure on the Souther children, that he already had a deal with them, and that he intended to obtain the business.

On October 18, "Mike Powers" again called the Renck residence. The caller asked to speak with Kenneth and told Allison that he had pictures of Kenneth and Allison paying $50,000 to the hitman who killed the Southers. The caller said the evidence would be sent to the district attorney if he could not see Kenneth that night.

Sometime after the murders, Shove asked his daughter to report his 4Runner stolen, but she refused because she was not the owner and had seen the vehicle a couple of days before. On October 24, Shove reported to police that his 4Runner had been stolen from the Industrial Salvage lot sometime between October 20 and 24. The vehicle was discovered 10 months later, abandoned near the Mexican border in a remote area of San Diego County. The ignition had not been tampered with, which was unusual for a stolen car; a key could have been used to drive the vehicle.

In late October, Christopher received a second suspicious envelope at Cal Aero addressed to Vann with a return address to "M. Powers," postmarked October 26. Christopher thought the handwriting on the envelope looked similar to the prior letter. Inside the envelope addressed to Vann was another envelope addressed to "Mr. & Mrs. Ken Renick [*sic*] [¶] Condolences." Inside that envelope was a lengthy unsigned typewritten letter addressed to "Detective Martinez"[4] that purported to detail the motive for and commission of the murders. The letter alleged that Hubert discovered that Kenneth had been stealing money from the safe and planned to disinherit the Rencks, and that Kenneth then hired a killer. The killer allegedly met "one of his employers" at a restaurant and was paid $50,000 to commit the murder; the killer supposedly hired a "surveillance specialist" to record and photograph the meeting "for the killer to use as insurance." The letter claimed that the first attempt on Hubert's life was unsuccessful and that Hubert then "sent a letter with retainer to our group" to "locate

_____

[4]     Los Angeles County Sheriff Deputy Joseph Martinez was one of the lead detectives investigating the murders.

and neutralize the killer" and discover who had sent him. When "[w]e" attempted to contact Hubert "on Tuesday, 8 days after the killer's first attempt," Hubert had already been murdered. The killer was, however, identified and brought to Mexico. The killer admitted that the Rencks had hired him. The killer also purportedly cut the bottom of the safe with a grinder, but it was empty. The killer wrote a letter to Kenneth "demanding to be paid more money."

On November 7, Kenneth received an envelope addressed to "Mr. Ken Renick" with a return address to "Mike" in San Ysidro. Inside was a letter from "Mike" addressed to "Mr. & Mrs Ken Renick," as well as a copy of the above-described letter to Detective Martinez. The letter claimed that Hubert "retained our organization to neutralize a threat to his life," that they had the killer in custody in Mexico, and that they had evidence that "clearly indicate[s] the real perpetrators of the contract murder." The letter offered to sell this evidence to the Rencks for $300,000. It concluded: "We can either clear you both by giving the Detectives leads away from you or give the District Attorney an irrefutable case. You can choose. We will contact you."

On November 26, Allison received a call at Cal Aero from "Mike Powers" who said that "Vann had the gold" and demanded Allison's cell phone number; when Allison refused, the caller said, "[I]t's your funeral."

On January 7, 2002, Shove and Steves went to Cal Aero and asked Allison if they could meet in private. Allison had known Steves through her father and recalled Shove's name from the offer letter. Shove told Allison that Kenneth had called his cell phone and accused Shove of murdering the Southers. Allison told Shove that was untrue and that no one in her family would know his number. Shove and Steves told Allison that

14

they were no longer interested in the business. That was the only time Allison had ever met or discussed Cal Aero with Shove.

### f. Search, interviews, and arrests

As detailed below in part II.A., officers executed a search warrant on Shove's home, leading to the recovery of a laptop computer on which the unsigned letter to Detective Martinez was stored, and which had been used to print the letter.

Vann admitted that he had lied when police first interviewed him shortly after the murders and burglary, and again in January of 2002. In these earlier encounters, Vann did not mention his involvement in the burglary, nor did he mention Shove; Vann instead told police that he believed Kenneth may have been involved. When Vann was arrested for burglary, extortion, and receiving stolen property on October 6, 2004, he decided to speak with police on these topics. The authorities and he agreed that nothing he related concerning the burglary could be used against him but that he could still be charged for the murders and extortion. On December 14, 2004, Vann pled guilty to commercial burglary in exchange for credit for time served and three years of probation, contingent upon testifying truthfully.

### 2. Defense Case

To demonstrate that calls between Hardin and Shove and demands for payment related to drug transactions, not murder, the defense presented J.M., who lived at Shove's house for a few months in 2001. J.M. knew Shove as Tony Bonanno, and understood the Bonannos were a mafia family. Shove claimed that he and some partners were going to purchase Paramount Studios and promised work in the film industry for J.M. and his

father. Sometime in 2001, J.M. met Hardin and Shove asked whether J.M. would be able to obtain cocaine from Hardin for personal use. Thereafter, J.M. acted as an intermediary between Shove and Hardin on several cocaine purchases before personally introducing the two. J.M. told a defense investigator that he hoped Shove did not "have anybody on the outside that could kill me."

In an effort to demonstrate that their phone calls at the time of the murder were consistent with their level of communication at the time, the defense presented a chart of phone calls between Hardin and Shove during June, July, and August of 2001. The chart reflects two calls in June, 74 calls in July, and 103 calls in August. The vast majority of these calls occurred between 9:00 a.m. and 10:00 p.m.

The defense presented evidence to rebut the prosecution's timeline of events. The Southers' neighbors testified that at around 8:30 p.m. on September 15, 2001, their dogs were acting strange and barking in the direction of the Southers' house. It took the defense investigator about an hour to drive from Hardin's home to the Souther residence on a Saturday night at 7:30 p.m. with light traffic. The distance from Shove's house to the Souther residence was about a 15- to 20-minute drive.

Detectives testified that during the investigation they learned the Southers' telephone was not working. Kenneth later notified them he had fixed the telephone and took them to the phone box, which would not be noticeable in the dark by anyone other than the residents or someone familiar with the area.

Vann did not tell police that Shove ever explicitly said that he was at the murder scene, just that "they" had done the "dry run" in the same manner as the murders. Vann told police that he believed "Monte's Army" had killed the Southers, given

Shove's statement that they were his enforcers; Vann also related his impression that Shove was behind everything. When police interviewed Vann on September 19, 2001, Vann stated that he thought Hubert usually kept about $300,000 in the safe.

A Cal Aero employee testified that Vann left work at 3:00 p.m. on the day of the burglary. At around 5:00 p.m., after everyone had left work for the day, the employee was at a gas station across the street when he observed Vann drive into the empty Cal Aero parking lot. Vann got out of his car, looked in and around two sets of bushes in front of the business, and jiggled two sets of doors leading into the business and the upstairs loft. The employee then drove away. Vann was alone, and the employee did not see Vann meet with anybody.

A Los Angeles County Sheriff's Department forensic document examiner testified that she examined the proposal letter Shove sent to B.G., the letter "Mike" sent to the Rencks, and the letter addressed to Detective Martinez; there were no physical characteristics among the letters to indicate that they came from a common source, nor could a common source be ruled out.

During the prosecution's case, Hardin's girlfriend had testified that it was cold and raining when she noticed the cut on Hardin's hand sometime around the end of September or beginning of October in 2001. The court took judicial notice that there was no rainfall in the area from August through October of 2001.

## B. Penalty Phase

### 1. Prosecution Case

The prosecution presented evidence that Shove had three prior convictions: a 1979 conviction for making a false

statement in a loan application and a threatening telephone communication, a 1980 conviction for robbery, and a 1988 conviction for theft. As to the robbery conviction, M.V. testified that he was in the rare coin business and had accompanied a client to a private residence to authenticate coins the client planned to purchase. When M.V. entered the residence, two masked men put guns to his head and escorted him and the client into the dining room, duct taped their hands behind their backs, and laid them face down on the floor. Two women were already bound and on the floor. Shove, the supposed seller, left with one of the gunmen to cash the client's cashier's checks; $4,000 in cash was taken from M.V.'s pocket.

Shove's older sister, M.J., testified that during an incident sometime in the late 1970's, Shove shoved M.J., cracking three of her ribs, and repeatedly struck her. Shove also threatened M.J. via email and middle of the night phone calls and visits. He told M.J. he was going to kill her. On one occasion in 2000 or 2001, M.J. woke up at 2:00 a.m. and saw Shove outside the window pointing what appeared to be a gun at her; Shove said, "[B]ang, you are dead," and disappeared.

J.H. testified that in 1987 or 1988, he was driving on a freeway when he tried to enter the same lane as Shove, resulting in one vehicle cutting the other off. They exchanged obscene hand gestures, after which J.H. believed the situation to be over. But when he pulled into a gas station about ten miles later, Shove approached and pointed a gun to the back of J.H.'s head and said, "Today is your last day on earth," or "Today you are going to die," and repeatedly called J.H. a racial epithet.

Shove's ex-wife, C.M., testified that Shove was physically violent with her during their marriage. When C.M. told Shove she wanted a divorce, Shove said that he would take C.M. to a

18

rural area, kill her, and bury her body so she would never be found. On another occasion, Shove strangled and tried to smother C.M. with a pillow, locked her in the bedroom, and threatened to "finish [her] off" if she yelled out. C.M. described Shove as a manipulative liar.

Shove's third wife, A.M., testified that Shove was regularly violent toward her, including incidents in which Shove strangled her, beat her, and tried to run her over with a car. Shove also threatened to kill A.M. and told her that he knew how to kill a person.

R.H., Shove's wife at the time of the murders, testified that Shove was violent with her "off and on" during their marriage. Shove once punched R.H. in the nose, causing it to bleed. On another occasion, Shove pushed her up against a wall and dragged her by the hair. Shove choked R.H., sometimes lifting her off the ground against a wall or holding her down on the floor. Shove also burned R.H. with a cigarette several times on her vagina.

As provided in further detail *post* in parts IV.B. and IV.C., the prosecution presented victim impact evidence through several family members of the victims: the Southers' daughters; one of their granddaughters; Elizabeth's sister; and Elizabeth's brother-in-law. The witnesses testified to how close they were with the Southers, the many good qualities that the Southers possessed, and how their murders devastated the family.

### 2. Defense Case

The defense presented two witnesses in its case in mitigation: Shove's wife at the time of trial, M.A., and M.A.'s 24-year-old son, J.T.

M.A. met Shove at the end of 2001 or beginning of 2002. At their first meeting, Shove told M.A. that he had been married

four times but that he loved all his wives and still helped if they needed anything.  M.A. had two sons from a prior relationship, and Shove was the first man M.A. dated whom she introduced to her sons.  M.A. and J.T. were both aware that Shove frequently used the alias "Tony Bonanno" and referred to him as such.  J.T. testified that Shove "was more of a father than my real dad, even in the short time I got to know him."  M.A. testified that Shove is a "wonderful" and "excellent" man with a "good heart" who was beloved by senior citizens at the Elks Lodge and related a time when he helped an elderly man who had fallen.  With J.T.'s blessing, Shove married M.A. in 2004.

M.A. denied any abuse or threats during their relationship and testified that Shove always treated her with respect.  J.T. confirmed that Shove treated his mother with respect, denied any abusive conduct, and stated that his mother always told him how great Shove treated her and how happy she was.  Shove did not tell M.A. about any abuse in his prior marriages but told her that he had been incarcerated for something he did not do.  J.T. did not believe Shove to be capable of domestic violence or murder and was unaware of Shove's criminal history.  M.A. frequently visited Shove in jail after his arrest.  Despite Shove's convictions, M.A. and J.T. wanted to maintain a relationship with Shove.

## II.  PRETRIAL ISSUES

### A.  Denial of Motion to Suppress Computer Evidence

Before trial, Shove unsuccessfully moved to suppress evidence seized from the search of his home on the ground that the search warrant affidavit failed to establish probable cause to search his residence.  Shove now renews the contention. We find no error in the admission of the evidence.

### 1. Background

On April 23, 2002, Los Angeles County Sheriff's Department Detective Linda Muse signed an affidavit in support of a warrant to search Shove's home for, among other items, personal computers and the data stored therein. A magistrate approved the warrant the same day.

In the affidavit, Detective Muse detailed the Southers' murders and the previous break-in at their home, the Cal Aero safe burglary, and the extortion letters and telephone calls. The affidavit described multiple reasons why investigators believed both Vann and Shove were involved in the burglary. Vann was aware that the office where the safe was located did not have an alarm system, he was the only Cal Aero employee who was aware of the safe's contents, and he believed the safe contained up to $300,000. The affidavit also detailed Vann's strange behavior, which Cal Aero employees observed before and after the burglary. As to Shove, the affidavit described Shove's efforts to purchase Cal Aero through the Souther family attorney after the murders, whose telephone number Shove had obtained from Vann, Shove's frequent communications with Vann, and his company's access to burglary tools.

The affidavit described the three computer-generated extortion letters and observed that the first letter was accompanied by a page from Elizabeth's will, which had been stolen from the safe. The affidavit observed that another letter demanded $300,000 from Kenneth to keep supposedly incriminating information about the murders from the police and that a person identifying himself as "Mike Powers" had telephoned Kenneth demanding the same $300,000 for the same purpose. The affidavit described how, after the murder, the white truck registered to Shove was at the Rencks' home and

how the driver of that truck told Kenneth's mother, who was present, his name was "Mike Powers" and falsely claimed he was there to visit Kenneth, when Kenneth knew no such person. Based on the evidence set forth in the affidavit, Detective Muse opined that Shove and Vann conspired to commit a burglary at Cal Aero after the murders, and to extort the Rencks when the money they expected to find inside the safe was not there. The affidavit did not expressly state that evidence of these offenses was suspected at Shove's residence.

Officers executed the search of Shove's residence on April 25, 2002, leading to the recovery of a laptop computer from inside the residence. An analysis revealed that the letter addressed to Detective Martinez had been stored on and printed from the seized computer days before the letter was received at Cal Aero.

Before trial, Shove filed a motion to suppress the computer evidence seized from his home, arguing that the affidavit lacked probable cause and the good faith exception to the exclusionary rule was inapplicable. The motion asserted there were "no articulable facts demonstrating probable cause that [he] was involved in the burglary at CAL AERO or the extortion of the Renck's and that evidence of his involvement will be found on a computer in his home." The motion continued: "Obviously, the police wanted to search defendant Shove's computers for evidence that he was the source of the computer generated extortion letters directed at the Rencks. However, the proper vehicle for obtaining a legal right to search defendant's property was through an affidavit to a search warrant demonstrating probable cause for such a search. . . . Here, there is simply no facts in the warrant to establish probable cause that defendant Shove was involved in the burglary and the extortion." More

particularly, there was "no reliable evidence connecting the use by defendant Shove of his computers to draft the letters." In opposing the motion, the prosecution detailed the facts pointing to Shove's involvement and argued that even if the facts were inadequate to support the magistrate's decision to issue the search warrant, officers in good faith relied on the validity of the warrant in executing the search.

At the hearing on the motion, Shove's counsel argued that the affidavit was insufficient to implicate Shove in the offenses, provided no nexus between the offenses and the residence, and that the information included therein was stale, noting that the last date referenced in the affidavit was October 11, 2001, months before the search. The trial court denied the motion, finding sufficient probable cause for its issuance and holding that regardless, the good-faith exception applied.

### 2. *Discussion*

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures" and requires search warrants to be supported by "probable cause." (U.S. Const., 4th Amend.) "In determining whether a search warrant is supported by probable cause, we consider 'whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 592, quoting *Illinois v. Gates* (1983) 462 U.S. 213, 238 (*Gates*).) Though " '[t]he test for probable cause is not reducible to "precise definition or quantification" ' . . . we have stated that it is ' "less than a preponderance of the evidence or even a prima facie case." ' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 659.) " 'The task of the issuing magistrate is simply to make a practical, commonsense decision whether,

given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 161 (*Carrington*), quoting *Gates*, at p. 238.) " ' "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." ' " (*Beck and Cruz*, at p. 592.) " 'The magistrate's determination of probable cause is entitled to deferential review,' " and "the warrant 'can be upset only if the affidavit fails as a matter of law to set forth sufficient competent evidence' supporting the finding of probable cause." (*Westerfield*, at p. 659.) Although the Fourth Amendment is silent about how it is to be enforced, " '[the high court] created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation.' " (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1220.) The exclusionary rule does not apply, however, where officers seized evidence " 'in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.' " (*United States v. Leon* (1984) 468 U.S. 897, 905 (*Leon*).)

*Leon* instructs that "[i]t is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." (*Leon, supra,* 468 U.S. at p. 923, fn. 24.) An officer would not "manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " (*Id*. at p. 923.) "[T]he test by which the 'objective reasonableness' of an officer's decision to submit an affidavit to a magistrate is to be judged . . . is whether

a reasonable and well-trained officer 'would have *known* that his affidavit failed to establish probable cause and that he should not have applied for the warrant.' " (*People v. Camarella* (1991) 54 Cal.3d 592, 605–606 (*Camarella*).)

Shove and the Attorney General dispute whether probable cause supported the warrant. We need not resolve this dispute because *Leon*'s good-faith exception would permit admission of the evidence in any event. (See *Leon, supra,* 468 U.S. at p. 905.)

Given the circumstances discussed in the affidavit — linking Shove with the fictitious Mike Powers and thereby to the crimes — the affidavit was not " 'so lacking in indicia of probable cause' " regarding Shove's involvement in the burglary and extortion so " 'as to render official belief in its existence entirely unreasonable.' " (*Leon, supra,* 468 U.S. at p. 923.) The question is whether it was reasonable to believe that evidence of those crimes would be found in Shove's home. (*Gates, supra,* 462 U.S. at p. 238; see *People v. Frank* (1985) 38 Cal.3d 711, 728–729 [" 'The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific "things" to be searched and seized are located on the property to which entry is sought' "]; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1206 ["Mere evidence of a suspect's guilt provides no cause to search his residence"].) Shove argues the affidavit provided no evidence to suggest that items related to the burglary or extortion would be found at his home, such that no reasonable officer could believe in good faith that it supported there was probable cause for the search. (*Leon, supra,* 468 U.S. at p. 923.) We disagree.

While the affidavit does not state facts directly indicating that particular evidence was likely to be found in Shove's home,

25

to establish probable cause "[i]t is not essential that there be direct evidence that such evidence will be at a particular location." (*People v. Sandlin* (1991) 230 Cal.App.3d 1310, 1315; accord, *U.S. v. Fannin* (9th Cir. 1987) 817 F.2d 1379, 1382 ["This circuit has recognized that '[d]irect evidence that contraband or evidence is at a particular location is not essential to establish probable cause to search the location' "].) Rather, " 'the nexus between the items to be seized and the place to be searched' can rest on 'normal inferences as to where a criminal would be likely to hide' evidence of his crimes." (*U.S. v. Kvashuk* (9th Cir. 2022) 29 F.4th 1077, 1085 (*Kvashuk*); accord, *People v. Lazarus* (2015) 238 Cal.App.4th 734, 764 [magistrate can " ' "draw reasonable inferences about where evidence is likely to be kept" ' "]; *Sandlin*, at p. 1315 [same]; *People v. Cleland* (1990) 225 Cal.App.3d 388, 392–393 [same].)

" ' "[A] number of California cases have recognized that from the nature of the crimes and the items sought, a magistrate can reasonably conclude that a suspect's residence is a logical place to look for specific incriminating items." ' " (*Carrington*, *supra*, 47 Cal.4th at p. 163; accord, *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 370 (*Bryant*).) For instance, in *Carrington*, *supra*, 47 Cal.4th at page 163, it was reasonable for a magistrate to conclude defendant's residence was the most likely place to find a copied key to the site of a burglary and stolen checks where the key was "the type of item one reasonably could expect a defendant to keep at home" and where, regarding the checks, "the affiant observed based upon his training and experience, 'subjects who steal checks with the intent to commit forgeries will maintain possession of those stolen checks until they can be cashed.' " And in an extortion case more closely resembling this one, the Ninth Circuit

explained that "the government would have probable cause to search for and seize instrumentalities likely to have been used to facilitate the transmission" of an extortionate communication, and a magistrate "could rightfully assume that there was a 'fair probability' that such evidence could be contained on computers or storage devices found in [the suspect's] residence," where a computer had been involved in the scheme. (*U.S. v. Adjani* (9th Cir. 2006) 452 F.3d 1140, 1146; see also *Kvashuk, supra,* 29 F.4th at p. 1085 ["the nature of cybercrime — specifically, its reliance on computers and personal electronic devices — is relevant to probable cause for searching the suspect's residence"], citing *Adjani,* at p. 1145.)

The affiant here describes her extensive training and experience and states that she had questioned suspects and witnesses "concerning the manner in which they commit their crimes, dispose of or hide evidence, and avoid discovery by law enforcement." The affidavit then ties Shove to the computer-generated extortion letters, one of which included the will burgled from the Cal Aero safe. As discussed, courts have in some circumstances found it reasonable for a magistrate to infer a fair probability that the perpetrator of a crime involving a computer will have computers at home with incriminating evidence. Whether or not a magistrate here could have inferred there was a fair probability that evidence of those extortion letters would be found at Shove's home, a well-trained officer reasonably could have "believed that the affidavit presented a close or debatable question on the issue of probable cause" (*Camarella, supra,* 54 Cal.3d at p. 606; see *Leon, supra,* 468 U.S. at p. 926 [the good-faith exception applies when an affidavit "provide[s] evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of

probable cause"]), such that the affidavit was not " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " (*Leon*, at p. 923.)

Contrary to Shove's contention, the passage of six months from the burglary and extortion did not render the affidavit so plainly "stale" as to alter this conclusion.  Even in 2001, it was generally understood that computer files could be retrieved even after deletion.  (See *U.S. v. Hay* (9th Cir. 2000) 231 F.3d 630, 636; see also *Kvashuk, supra,* 29 F.4th at p. 1087 ["[E]vidence of a crime typically remains on a computer even if the defendant attempts to delete it"]).  We discern no error in the admission of the evidence obtained in the search.

## B. Exclusion of Third Party Culpability and Impeachment Evidence

Shove contends that the trial court abused its discretion when it precluded presentation of evidence that would have tended to suggest that others were responsible for the murders. Shove argues that precluding the presentation of third party culpability evidence violated his state and federal constitutional rights, requiring reversal of his murder convictions and death judgment.  We hold that the trial court did not abuse its discretion in excluding this evidence.

### 1. *Background*

#### a. *Evidence regarding Kenneth's culpability*

##### *(1) Proffers Accompanying Motion in Limine*

Before trial, the prosecution moved in limine to exclude alleged third party culpability evidence pertaining to Kenneth and Vann under Evidence Code section 352 and *People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).

Opposing the motion, Shove contended that Kenneth would have a motive to commit the murders. Specifically, Shove alleged: (1) Kenneth is married to the victims' daughter, Allison, who stood to inherit the victims' business and other assets; (2) Kenneth told a witness that he stayed in his marriage only because of that future inheritance; (3) Hubert had accused Kenneth of stealing from the business; and (4) shortly before the murders, Allison told Hubert that she no longer wanted his financial support, a decision which Kenneth opposed.

Shove also asserted that there was evidence linking Kenneth to the crimes. Shove alleged, among other things, that: Kenneth did not have an alibi for the time the crimes were committed; the victims' telephone line had been disabled and Kenneth led officers to a phone box hidden on the property and reconnected the phone wires; the perpetrator did not disconnect the burglar alarm and Elizabeth recently told Kenneth and Allison that the alarm was not working; the victims were badly beaten, which suggested that the killer was personally angry with the victims and tended to undermine a murder for hire theory; "[m]any witnesses indicated [Hubert's] total disdain and dislike" of Kenneth; two sets of separate footprints not linked to Hardin or the victims "indicate[d] other persons were involved"; Hubert kept cash at his business and two years after the homicides, Allison's friend, L.P., saw Kenneth with a suitcase full of cash; after the murders, Kenneth exhibited "no expression of grief" and made several inappropriate comments; Kenneth "did not show any fear" when he received the extortion letters "and seemed like he knew about the letters before hand"; Kenneth became uncooperative with the police and convinced his wife to be uncooperative as well; the victims "had just retired to bed" when they were killed, indicating somebody knew what

29

time they would go to bed; Kenneth told witnesses that Hubert did not have his hearing aid in at the time of the crime; and instead of hiring a cleaning company, Kenneth insisted on cleaning up the victims' blood himself.

In support of this proffer, Shove attached police and defense investigators' notes and narratives of the investigation, transcripts of witness interviews, and an affidavit for a warrant to collect DNA from Kenneth, Vann, Reiland, Shove, and Proulx in which a detective opined that Kenneth and Allison may have been involved in a conspiracy to murder the Southers because they financially benefited from their deaths.

At the hearing on the motion, the prosecutor observed that several of Shove's assertions were not supported by the materials submitted, and even if they were, they made no connection between Kenneth and the crimes. The trial court ultimately ruled that Shove failed to meet the standard *Hall* articulated for the introduction of third party culpability evidence. The court noted that it had reviewed the materials attached to Shove's motion in detail and found that Shove had provided "perhaps motive" and "perhaps opportunity," but failed to proffer evidence "actually connect[ing] [Kenneth] to the crime." The court also found that the evidence would be time-consuming and would confuse and distract the jury.

*(2) Kenneth's Statements to Proulx*

After jury selection and before opening statements, Shove's counsel requested reconsideration of the court's ruling, claiming that he discovered "some evidence" of Kenneth "confessing to doing the murder." Shove's counsel related Proulx's purported tape-recorded statement to police that Proulx, in the paraphrasing of Shove's counsel, "call[ed]

[Kenneth] and he hear[d] [Kenneth] put his hand over the phone and say, 'hey, they know I did it' or something like that." But because Proulx had admitted complicity in the burglaries, the trial court would not allow Shove's counsel to discuss Proulx's statement in his opening statement without having Proulx brought to court and appointed counsel. The court declined to rule without knowing that Proulx would testify to that statement. Shove's and Hardin's counsel argued that if Proulx were unavailable, the officer who heard the statement could testify to it as a declaration against interest. The court declined to rule on the oral motion and suggested the parties "put it in writing and be specific." Shove does not point to any subsequent written motion or other attempt to introduce Proulx's statement.[5]

### (3) L.P.'s Interactions with Allison and Kenneth

Shove's counsel argued that he was entitled to impeach Kenneth's denial that he had "ever show[n] anybody a large

---

[5] Shove contends that this information was already before the trial court in his Penal Code section 995 motion in which he challenged the untimely disclosure of Proulx's interview. As provided in the investigators' narrative of the interview attached to that motion, Proulx admitted to the safe burglary and making the extortion calls, and told investigators that in the first extortion call, he "thought Ken[neth] put his hand over the mouth piece and said something like, 'We have been caught.'" The Penal Code section 995 motion did not, however, concern the admissibility of Proulx's statement and was filed nearly two years before Shove's counsel orally sought its admission at trial. Additionally, to the extent this report of Proulx's recollection of Kenneth's words differs from Shove's counsel's proffer at trial, there is no suggestion that either phrasing changes the outcome.

satchel of cash" with L.P.'s proffered testimony that "shortly after the murders," Kenneth showed her a "very large suitcase of stacked bills." Shove's counsel claimed that this evidence was relevant to Kenneth's credibility and motive. Shove's counsel also asserted that L.P. would testify that investigators had threatened she would be killed if she testified.

At an Evidence Code section 402 hearing, L.P. testified that Allison was her best friend. Investigators interviewed L.P. sometime after the murders and over the next two or three years she faxed them her notes of evidence indicating that Kenneth might have been involved. When L.P. noticed a discrepancy between what Kenneth had testified to at the preliminary hearing and what he had told her, L.P. reached out and met with detectives, who told L.P. that they never read her faxes and that they already had the people that they believed were responsible. L.P. testified that one detective threatened that L.P. would be killed if she testified, and that she "blew [their] whole case." L.P. also testified that another detective later told her that, "unofficially," they did not want her talking to or sharing the faxes with defense investigators. Finally, L.P. testified that on September 9, 2003, Kenneth told her he had enough money to leave Allison to be with L.P. and showed her a briefcase full of cash and Cal Aero checks. Kenneth gave L.P. $200 and left to go to an aerospace auction to bid on items for the shop.

The trial court observed that the briefcase incident occurred two years after the murders, and that it was "classic extrinsic impeachment on a collateral matter." As to the alleged threat, Shove's counsel argued that it was relevant to his argument that some witness testimony was the "product of other people's suggestion" and that L.P. was "relaying some things that clearly reflect upon how witnesses have been approached

in this case." The court precluded Shove's counsel from impeaching Kenneth with L.P.'s testimony.

### b. *Evidence regarding Vann's culpability*

In ruling on the prosecution's earlier request, both Shove's counsel and the trial court focused exclusively on third party culpability evidence as to Kenneth; they did not address Vann. Before opening statements, the prosecution orally renewed its motion to exclude third party culpability evidence as to Vann. Opposing the motion, Hardin's counsel claimed there was evidence implicating Vann in the murders: specifically, there were phone calls between Shove and Vann; there was evidence that Vann was involved in the safe burglary; and there was evidence that Vann knew details about the crime that only someone who was there would have known. The trial court advised Hardin's counsel to "put that specifically in writing and . . . list what those things are," and denied the motion "on the basis of an inadequate showing . . . ." Shove cites nothing in the record indicating that either his or Hardin's counsel ever followed up by filing a written third party culpability motion as to Vann.

During the guilt phase defense case, Shove's counsel sought to call Vann's wife to establish a connection between Hardin and Vann. He explained that there was evidence that Hardin sold toys and that Vann's wife would testify that the Vanns had a side business selling toys on eBay.[6] When the trial court commented that Shove's counsel could present evidence of "an actual connection if you have one, but not a maybe," defense

---

[6] Hardin's girlfriend testified that one of the ways Hardin earned a living was by selling children's toys, such as water guns.

counsel went on to argue that witnesses said Hardin and Vann had been at the same parties, socialized, and did drugs together. The trial court did not recall evidence that Hardin and Vann did drugs together. Shove's counsel agreed but argued, "[Y]ou heard that Vann was at these parties where Mr. Hardin was at the barbecues. They would be there together." Shove's counsel further contended that Hardin used to do work for Industrial Salvage, which did business with Cal Aero. Although there was no direct evidence that Vann ever hired Hardin, "circumstantially the jury can draw inferences of relationships from other circumstances." The trial court found the proffer inadequate and precluded Shove's counsel from presenting evidence of the Vanns' toy business.

Shove's counsel also sought to call Cal Aero employee F.G. to testify that Vann was a braggart who said he knew people with guns and Hell's Angels. Shove's counsel argued this was to impeach Vann's credibility, as Vann testified he was scared of Shove and his alleged mafia connections. The trial court excluded this testimony as irrelevant and denied a motion for a mistrial based on this ruling. Shove's counsel also sought to introduce F.G.'s testimony that Vann was aware that an unrelated employee was stealing from the business but did nothing about it. Shove's counsel argued this would impeach Vann's credibility, as Vann testified that nobody ever confronted him with someone stealing from the business; Shove's counsel further argued that Vann's failure to respond to the stealing "is indicative that he was involved." The court excluded this

testimony as irrelevant and more prejudicial than probative under Evidence Code section 352.[7]

### 2. *Discussion*

#### a. *Challenge to* Hall

The Evidence Code instructs that evidence is admissible only if relevant (Evid. Code, § 350), meaning it must have a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (*id.*, § 210). " 'A trial court has "considerable discretion" in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects.' " (*People v. Miles* (2020) 9 Cal.5th 513, 587 (*Miles*).)

In *Hall*, we applied these general principles to the admission of third party evidence. We instructed: "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial

---

**7** The court did not reject, and the prosecutor did not object to, Shove's counsel's proffer that F.G. would testify that he did not see any other cars on the night of the burglary, contrary to Vann's claim that after arriving at the parking lot, he was soon met by Shove and Proulx.

evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* 41 Cal.3d at p. 833.) We directed courts to "simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)." (*Id.* at p. 834.)

Shove says he has no quarrel with applying the relevance and prejudice provisions of Evidence Code sections 350 and 352 to third party culpability evidence. He argues, however, that requiring a defendant to "connect a specific third person to the commission of the crime before third party culpability evidence may be admitted" goes beyond the requirements of the Evidence Code and in so doing "prevents the defendant from presenting all the facts necessary to present a meaningful defense."

We rejected both of these arguments in *Hall.* We there explained that the Evidence Code requires evidence of a third party's connection to the crime because evidence that does no more than suggest that someone else had a motive or the opportunity to commit the murder "will not suffice to raise a reasonable doubt" as to the defendant, and so is not relevant and admissible. (*Hall, supra,* 41 Cal.3d at p. 833.) To the extent Shove argues that *Hall* infringes his constitutional right to present a defense, we rejected the same argument in *Hall* and have consistently rejected it since. (*People v. Clark* (2016) 63 Cal.4th 522, 597, fn. 54; *People v. Farmer* (1989) 47 Cal.3d 888, 921; see *Hall,* at pp. 834–835; see also, e.g., *People v. Bracamontes* (2022) 12 Cal.5th 977, 1001 [applying *Hall*]; *People v. Dworak* (2021) 11 Cal.5th 881, 895 (*Dworak*) [same]; *People v. Turner* (2020) 10 Cal.5th 786, 816–818 (*Turner*); *People v. Page* (2008) 44 Cal.4th 1, 37, fn. 16, 39 .) Shove offers

no persuasive reason to reconsider.[8]  We also reject Shove's assertion that *Hall* is a judicially created modification of the

---

[8]     Shove relies on *Holmes v. South Carolina* (2006) 547 U.S. 319, but *Holmes* does not help his case.  There, the high court invalidated an evidence rule under which a defendant could not "introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." (*Id.* at p. 321; *id.* at p. 331.)  As this court has previously noted, and as the *Holmes* opinion itself appears to acknowledge, *Hall*'s instructions about how to apply Evidence Code sections 350 and 352 to third party culpability evidence bear no material resemblance to the unusual rule at issue in *Holmes*, which expressly conditioned admissibility of third party culpability evidence on the strength of the prosecution's case. (*People v. Robinson* (2005) 37 Cal.4th 592, 627, fn. 17 [concluding that the then-recent grant of certiorari in *Holmes* did not affect *Hall*, given South Carolina's "unique" and "very restrictive rule" concerning third party culpability evidence "does not apply in California"]; see *Holmes*, at p. 327 & fn. * [observing that state evidentiary rules excluding third party culpability evidence that is too remote, speculative, or fails to sufficiently connect another person to the crime "are widely accepted," citing *Hall* among other cases]; see also *People v. Linton* (2013) 56 Cal.4th 1146, 1202.)

Shove's reliance on *State v. Meister* (2009) 148 Idaho 236 is also misplaced.  There, the Idaho Supreme Court invalidated its prior holding that in order to present evidence of an alternate perpetrator, "a defendant must produce a 'train of facts or circumstances, as tend clearly to point out some one besides the [defendant] as the guilty party.' " (*Id.* at p. 240.)  The court held that the subsequent adoption of the Idaho Rules of Evidence, which established standards for the admission of relevant evidence, implicitly overruled its prior rule. (*Id.* at pp. 240–241.)  The trial court there thus erred in excluding proffered evidence based on the Idaho Supreme Court's prior decision instead of applying the rules of evidence. (*Id.* at p. 241.)  *Hall*, in contrast, directed courts to "simply treat third-party culpability evidence like any other evidence" under the Evidence Code. (*Hall, supra*, 41 Cal.3d at p. 834.)

37

Evidence Code, treats third party culpability evidence as a special category of evidence, or is a sufficiency rather than a relevance test.

> b. *The trial court did not err in excluding proffered third party culpability evidence under* Hall

Shove argues that even under the *Hall* standard, the trial court erred in precluding his proffered evidence of third party culpability. We review the trial court's decision to exclude such evidence for abuse of discretion. (*People v. Brady* (2010) 50 Cal.4th 547, 558.) " ' "We will not disturb a trial court's exercise of discretion under Evidence Code section 352 ' "*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " ' " (*Miles*, *supra*, 9 Cal.5th at pp. 587–588.)

Shove first argues that the trial court erred in precluding evidence of Proulx's statement that during the first extortion call, Kenneth said something about being "caught" that Shove contends is evidence that Kenneth admitted to being the perpetrator.[9] But, as noted, the court did not rule on the admissibility of Proulx's out-of-court statement as alleged third party culpability evidence. The court instead prohibited Shove's counsel from discussing this hearsay statement during the defense's opening statement — a ruling Shove does not challenge here — and deferred ruling on its admissibility pending either the production of Proulx to determine if he would assert his privilege against self-incrimination, or briefing on an

---

[9] As noted, there are two versions of this supposed statement in the record. (See fn. 5, *ante*.)

alternate theory of admissibility in the event Proulx was unavailable. Shove's counsel did not pursue either course of action. He thus never secured a ruling on the admissibility of the evidence, and so he has not preserved the issue on appeal. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 827; *People v. Rowland* (1992) 4 Cal.4th 238, 259.)

The trial court reasonably found that the other proffered evidence concerning Kenneth might establish either motive or opportunity but did not constitute direct or circumstantial evidence connecting Kenneth to any of the crimes. Shove's theories about Kenneth's possible motive, as well as evidence of Hubert's disdain for Kenneth, were insufficient to raise a reasonable doubt regarding Shove's guilt. (See *Hall, supra,* 41 Cal.3d at p. 833.)

The same is true of Kenneth's purported lack of alibi. Shove did not, and does not, explain what evidence supported his assertion that Kenneth did not have an alibi at the time of the crimes. But even if the assertion were true, the evidence would go only to whether Kenneth had a possible opportunity to commit the crimes, which is not sufficient. (See, e.g., *People v. Ghobrial* (2018) 5 Cal.5th 250, 284 ["evidence showing only a third party's possible opportunity is inadmissible"].)

Other evidence not solely relating to motive or opportunity was tenuous and speculative and the trial court reasonably excluded it. Although the trial court ruled that evidence of multiple sets of footprints was admissible, the court reasonably concluded that the footprints could not be used to argue Kenneth's culpability because they did not tend to link Kenneth or any other specific person to the crimes. (See *Turner, supra,* 10 Cal.5th at pp. 816–817 ["admissible evidence of this nature points to the culpability of a *specific* third party, not the

possibility that some unidentified third party could have committed the crime"].) Kenneth's allegedly callous behavior after the murders did nothing to link him "to the actual perpetration of the crime." (*Hall*, *supra*, 41 Cal.3d at p. 833.) Nor does speculation as to why Kenneth became uncooperative with police; why (presumably after the crime scene had been processed) he wanted to clean the victims' blood himself rather than hire a cleaning company; or why he purportedly "did not show any fear and seemed like he knew about" the extortion letters beforehand.

Shove's counsel hypothesized Kenneth's involvement based on the facts that the victims were badly beaten and that the victims were killed after they had gone to bed; he contended that the brutality of the beating suggests the perpetrator's emotional involvement with the victims, and that the timing suggests the perpetrator was someone aware of their daily habits. But the trial court reasonably concluded that such speculative evidence did not raise a reasonable doubt of Shove's guilt. (See *People v. Young* (2019) 7 Cal.5th 905, 938; *People v. Lewis* (2001) 26 Cal.4th 334, 373.)

The trial court likewise reasonably determined that L.P.'s proffered testimony that Kenneth possessed a briefcase full of cash nearly two years after the murders was too tenuous to link Kenneth to the perpetration of the murders. L.P.'s proffered testimony that Kenneth told her that Hubert did not hear the killers because he did not have his hearing aid in at the time of the crime is also insufficient. Shove does not point to evidence Hubert was in fact not wearing his hearing aids, but, in any event, it would generally be expected that one would not wear hearing aids to bed. L.P.'s further allegation that detectives had threatened her was a collateral matter that did not, in this

context, link Kenneth to the perpetration of the murders and the trial court was within its discretion to exclude it under Evidence Code section 352.

As to Hardin's counsel's general claim that there was evidence implicating Vann in the murders, neither defense counsel submitted a specific offer of proof as requested by the trial court, thus the claim has not been preserved for appeal. (See *People v. Valdez* (2004) 32 Cal.4th 73, 108 (*Valdez*) [an offer of proof must inform the trial court of the purpose and relevance of the excluded evidence to preserve a claim concerning the improper exclusion of evidence].)

As to Shove's proffered third party culpability evidence, the trial court did not err in precluding Shove's counsel from calling Vann's wife as a witness in the defense case. Her anticipated testimony that she and Vann sold toys online would establish no substantial connection to Hardin, merely because there was evidence that Hardin also sold toys. The trial court also reasonably concluded that evidence that Vann bragged about knowing Hell's Angels or people with guns, or that he allegedly did nothing about someone stealing from Cal Aero, was irrelevant and/or unduly time-consuming relative to its probative value.

Even if we were to assume error, it is not reasonably probable the exclusion of third party culpability evidence affected the verdict. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 611–612 [applicable standard of prejudice for erroneous exclusion of third party culpability evidence is that for state law error]; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Much of the evidence that Shove's counsel had sought to introduce was ultimately presented at trial. Shove's counsel was allowed to cross-examine Kenneth concerning his

knowledge of the phone box and his discovery and repair of the phone lines. Evidence was introduced that there appeared to be two different patterned shoeprints found at the murder scene, and the medical examiner testified to the victims' severe injuries. Additionally, Vann testified that he found some of Kenneth's behavior after the murders inappropriate and that Kenneth was laughing and joking at the Southers' funeral. Vann also testified that he had told police he thought Kenneth was stealing from Cal Aero and might have committed the murders. Allison testified that she broke off communication with police for a period of time in 2002. Kenneth and Allison testified concerning Kenneth's whereabouts at the time of the murders. There was also evidence that Shove hosted many barbecues, some of which Vann and Hardin attended, and that Hardin had done business with Industrial Salvage.[10]

---

[10] Shove takes issue with the prosecution's closing argument that there was no connection between Hardin and Vann or Hardin and the victims except for Shove, claiming that the prosecution "took full advantage of the trial court's erroneous ruling" because the excluded evidence would have provided that connection. We reject this argument because this is not an instance where, as Shove argues, the state improperly "benefit[ed] from an evidentiary void the state created." Rather, as discussed, Shove's speculative attempts to link Vann and Hardin through their respective toy businesses was properly excluded and the jury did hear evidence about Vann and Hardin attending Shove's parties and each doing business with Industrial Salvage, which would have permitted Shove's counsel to object to or argue against the prosecutor's characterization of the evidence. Indeed, Shove's counsel argued in closing there was evidence that Hardin was seen with Vann at a barbecue.

We also note that although Shove cites cases concerning the impropriety of a prosecutor using precluded evidence to its

Accordingly, to the extent third party culpability evidence could potentially link Kenneth or Vann to the murders, it was largely "adequately placed before the jury." (*Hall, supra,* 41 Cal.3d at p. 835.) Furthermore, evidence of Kenneth's or Vann's "culpability would not tend to exculpate [Shove] in any event. Because no testimony or circumstantial evidence limited the number of perpetrators, [Kenneth's or Vann's] participation would not undermine the significant evidence linking [Shove] to the murder." (*Ibid.*) The jury heard considerable evidence of Shove's extensive involvement in the entire scheme encompassing the murders, burglary, and extortion. The additional third party culpability evidence would not have negated the evidence of Shove's responsibility for the crimes; at most, it would have potentially suggested that others may have been responsible as well.

---

advantage, he does not raise a claim of prosecutorial misconduct on that ground. Instead, in discussing the prejudicial nature of asserted *Griffin* error (see *post,* pt. III.B.1), Shove calls such prosecutorial tactics "improper" and asserts they cumulated with the *Griffin* error to alter the result of his trial.

Shove also summarily claims, in a footnote within his discussion of the asserted prejudice flowing from the trial court's evidentiary exclusions, that the prosecutor personally vouched for Vann's truthfulness by arguing that Vann did not lie to the jury. Shove later states the bare conclusion that this vouching was misconduct that prejudicially cumulated with the prosecution's asserted misconduct in appealing to sympathy. (See *post,* pt. III.B.2.) To the extent Shove attempts to raise such misconduct claims, we agree with the Attorney General that the " 'point is not properly raised: it is perfunctorily asserted without argument in support.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 830, fn. 6 (*Daveggio*).) Furthermore, Shove's counsel raised no trial court objections on these grounds.

### C. Admission of Audio Recording

Shove argues that the trial court erred in admitting an audio recording wherein he claimed to have only two talents: the ability to talk people into anything and to kill when the reason was right. Shove contends the recording was irrelevant, constituted impermissible character evidence, and that any probative value was outweighed by the danger of unfair prejudice. (Evid. Code, §§ 351, 352, 1101, subd. (a).) He further argues that the admission of the recording rendered his trial and death sentence fundamentally unfair. We find no ground for reversal.

#### 1. Background

In 2004, Shove's ex-wife provided investigators with an audiotape containing a recording of Shove made sometime before 1990. Shove is the only person heard on the recording, and there is no stated purpose for the narrative.

The recording begins with Shove providing a vague account of a failed attempt to "set up" an unknown entity that owned a "drug-way to the U.S." to "kill their financial backing." Shove states: "Both families issued a contract. So I have a ton of $50,000 on my head. I got a hole in my chest. The pain is unreal. Not only the pain of being set up, but the pain to know that you failed." Shove then recounts purported childhood memories and reminisces about how he "was known for a mile radius" from his house and how he "had a knack of making money" as a child through various ventures. Shove also relates that he befriended the Bonanno crime family that lived across the street, stating, "that's where I got my name."

Shove then claims that he served two tours of duty in Vietnam and "made sergeant." Shove recounts that he "was a good killer" and "saw things I don't even want to repeat, episodes

44

going into villages, killing everything that lived." Shove continued: "I learned only one thing out of life, to live. This is what went thru [*sic*] my mind on how to survive." Shove states he then "signed on as mercenary paid for by the United States government" who "pay you so much a head to kill people in a foreign war," and that "I don't think you ever forget the faces of the many, many, many people you kill . . . ."

Shove claims, "[W]henever I talk, I can draw a crowd," and the recording concludes with Shove stating: "I can talk people into anything. You listen to me for five minutes and you'll follow me for five years. That was my motto. That's what I can do. I can't sing. I can't have no other talents, only that, that and the ability to go kill, if the reason was right."

Before trial, the parties debated the admissibility of the recording. The prosecutor argued that the statements in the recording were admissible as admissions or constituted "generic threat[s]" relevant to show Shove's state of mind, including motive, malice, intent to kill, and premeditation and deliberation. The defense countered that the recording was irrelevant, constituted inadmissible hearsay and impermissible character evidence, and that its prejudicial effect substantially outweighed its probative value. (Evid. Code, §§ 350, 352.) Based on the argument and authorities submitted by the prosecutor, the trial court ruled that the recording was admissible.

The prosecutor concluded his guilt phase opening statement by stating he would "leave you with a flavor of Theodore Shove . . . . whether it's being spoken while Shove's foot is in the world of fantasy or reality will be for you to decide, but it is a tape of Theodore Shove nonetheless giving you a glimpse into the mind of Tony Bonanno, Theodore Shove, giving

you a view into his thought process." Over Shove's counsel's objection, the prosecutor then played the final portion of the recording beginning with "I can talk people into anything. . . ." At trial, a detective testified to receiving the tape from Shove's ex-wife, the recording was played in its entirety, and the jury received a transcript. The recording was again played during the prosecutor's guilt phase closing argument.

### 2. *Discussion*

Shove argues that the statements in the recording should not have been admitted because they were irrelevant and constituted impermissible character evidence and because any probative value was outweighed by the danger of unfair prejudice. (Evid. Code, §§ 350, 352.) The Attorney General argues, as the prosecutor did below, that evidence of this alleged "generic threat" was relevant to show Shove's state of mind, including motive, malice, intent to kill, and premeditation and deliberation.

"Evidence of a defendant's statement regarding possible future criminal conduct in a hypothetical situation has at least as great a potential for prejudice in suggesting a propensity to commit crime as evidence of other crimes. Therefore, the content of and circumstances in which such statements are made must be carefully examined both in determining whether the statements fall within the state-of-mind exception, as circumstantial evidence that defendant acted in accordance with his stated intent, and in assessing whether the probative value of the evidence outweighs that potential prejudicial effect." (*People v. Karis* (1988) 46 Cal.3d 612, 636 (*Karis*).) As a general matter, a "generic threat" may be "admissible to show the defendant's homicidal intent where other evidence brings the actual victim within the scope of the threat." (*People v.*

46

*Rodriguez* (1986) 42 Cal.3d 730, 757.) But such evidence is inadmissible where "the circumstances in which the statements were made, the lapse of time, or other evidence suggests that the state of mind was transitory and no longer existed at the time of the charged offense." (*Karis*, at p. 637.)

Here, there is little in or about the recording to show Shove's state of mind at the time of the murders. The imagined future circumstances and potential class of victims within the scope of Shove's statements are indistinct and potentially limitless. The recording was also made more than a decade before the murders, at a time when Shove was unaware of the Southers' existence, and its relevance to his state of mind at the time of the offenses is unclear. Further, the recording appears to have been an amalgamation of true biographical events interspersed with fiction. There was, for instance, no evidence that Shove had ever served in the armed forces; the investigator who obtained the recording testified that he did not verify whether Shove ever served in Vietnam or contracted with the government afterwards, and the record is otherwise silent as to any military service. Moreover, there is no known purpose for the recording aside from Shove's counsel's assertion that it was made in preparation for writing a book, rendering the trustworthiness of the statements questionable. (See Evid. Code, § 1252; *Karis*, *supra*, 46 Cal.3d at p. 635.) Indeed, the prosecution seemingly accepted the fictitious nature of portions of the recording by stating in its opening statement, "whether it's being spoken while Shove's foot is in the world of fantasy or reality will be for you to decide . . . ." Given all the circumstances, the trial court erred in admitting the recording.

It is not, however, reasonably probable that Shove would have received a more favorable result had the recording been

excluded. (See *Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Chism* (2014) 58 Cal.4th 1266, 1298 (*Chism*) [erroneous admission of evidence at the guilt phase is reviewed under *Watson* standard].) There was considerable evidence of Shove's involvement in the murders and as the mastermind behind the entire scheme, including Shove's interest in and extensive efforts to obtain Cal Aero, his relationship to and communications with Hardin at the time of the murders, and his involvement in the safe burglary, a fruit of which was used in the extortion scheme. To be sure, the prosecutor argued in closing that the recording was evidence "in [Shove's] own words" of his ability "to talk people into things and to kill," and asserted "[t]hat's who this man is." But Shove's vague statements on the recording concerning his persuasive faculties and ability to intimidate were largely duplicative of the more specific testimony of multiple witnesses who described these attributes in some detail. Likewise, the recording's value in supporting the prosecution's theory that Shove's thought processes were partially based in fantasy was largely duplicative of other admissible, more contemporary evidence demonstrating as much. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 828–830 (*Riccardi*).) Several witnesses testified to Shove's other fantastical claims, such as his repeated assertions that he had mafia connections, his assertions that he had been a CIA agent, that he was going to purchase Paramount Studios, and that he had a group of enforcers who would conduct clandestine operations on his behalf. As for the statements about the ability to kill, the statements in the recording were connected to fighting for the United States in the Vietnam War; they made no mention of any plot to murder or hire a killer for financial gain.

Ultimately, for many of the same reasons the recording was irrelevant to prove Shove's state of mind at the time of the murders, the admission of the recording for this point was harmless. To be sure, the prosecutor evidently believed the recording was useful evidence of Shove's state of mind and mentioned the recording in his opening statement and closing argument. But the jury would have understood the limited probativeness of the recording: as Shove's counsel pointed out in his guilt phase closing argument, it was made more than a decade before the murders, in the recording Shove laid out no concrete plan, his stories seemed fantastical, and he sounded intoxicated.

For the same reasons, we discern no fundamental unfairness in the admission of this evidence and reject Shove's federal due process claim. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"].) Nor is there any reasonable possibility that the jury would have rendered a different penalty phase verdict absent the evidence. (See *People v. Pineda* (2022) 13 Cal.5th 186, 225–226.) The recording was not mentioned during the prosecution's penalty phase argument and "[i]n light of the other evidence before the jury, it is clear beyond any reasonable doubt that [the admission of this evidence] did not impact the outcome at the penalty phase." (*Id.* at p. 227.)

### D. Admission of Evidence Concerning Use of Alias

Shove argues the trial court abused its discretion by admitting evidence that he used the alias "Tony Bonanno." Shove contends that the evidence was irrelevant and highly inflammatory, resulting in the violation of the Evidence Code

and his constitutional rights to a fair trial, the right to due process, and a reliable death judgment.  We see no error.

### 1. *Background*

Before opening statements, Shove's counsel objected to the prosecutor referring to Shove as "Tony Bonanno."  The prosecutor responded that several witnesses knew Shove as Tony Bonanno or that he used the alias, and that "[t]his whole mystique that he tries to create in intimidating witnesses is to say that he's a mafia man and he's Tony Bonanno."  The trial court overruled the objection.

The prosecutor repeatedly referenced the alias in his opening statement, explaining that witnesses would testify that Shove consistently used the name and "depending with whom he's speaking, he's either connected to the Italian mafia, the Russian mafia, or the Mexican mafia, but that it a consistent theme of Mr. Shove, Mr. Bonanno, in his scheme to exploit and intimidate others to do his dirty work for him."

Stanley Steves testified that Shove "always asked me to call him Tony . . . Bonanno," that he had heard Shove refer to himself as such to others, and that Shove stated on multiple occasions and to others that he knew people in the mafia.  Shove's ex-wife, R.H., testified that Shove often referred to himself as Tony Bonanno, would receive phone calls asking for Tony Bonanno, and stated that he had mafia "connections," had done legal work for the "Bonnano Family," and was "basically their private attorney."  Shove's daughter also heard Shove refer to himself as Tony Bonanno and he would commonly reference his mafia connections.  Defense witness J.M. stated that he knew Shove as "Tony Bonanno" and introduced Shove to Hardin as such.  J.M. stated that the Bonannos were a mafia family and that he "wasn't sure that [Shove] wasn't a Bonnano at the time."

The prosecutor again referenced the Bonanno alias during closing argument.  The prosecutor argued that Shove used the alias and claimed to be part of the mafia "to intimidate people, to let them think that he has some kind of power and influence and connections."

At the penalty phase, Shove's stepson testified that "we always called [Shove] Tony as a term of endearment" and that Shove used the alias "quite frequently" and said it was his "business name."  Shove's wife testified that Shove told her his legal name and his alias and that "[t]hey call me Tony over here."  The prosecutor twice referenced the alias in penalty phase closing argument.

### 2.  *Discussion*

Shove contends that his use of the alias was irrelevant because his identity was not at issue at trial, it was not relevant to any other material fact in the case, and it was otherwise far more prejudicial than probative.  We disagree.

We agree that the alias had minimal probative value as to identity.  Though Steves and J.M. knew Shove as Tony Bonanno, each was able to identify Shove at trial by his legal name without reference to his alias.  (See *People v. Lee* (2011) 51 Cal.4th 620, 643 (*Lee*) ["evidence of [the defendant's] nickname was cumulative of other evidence of identity and therefore had minimal probative value"]; cf. *People v. Brown* (2003) 31 Cal.4th 518, 551 (*Brown*) ["sometimes reference to defendant's nickname was necessary to render a witness's testimony understandable," and because identity was at issue, trial court did not err in "acquiescing in the inevitability that it would come out before the jury"].)

But we disagree that the alias was not relevant to any other issue in the case.  It was relevant to Shove's state of mind

or intent with respect to the charged offenses. Indeed, the prosecution's primary reason for introducing evidence regarding the alias was to establish that Shove cultivated a "mystique" of being a "mafia man" to intimidate others, including the other participants in the scheme. Shove argues that no witnesses other than Vann stated that Shove intimidated them, and that Vann was only aware that Shove referred to himself as "Tony" and was unaware of his use of the Bonanno surname. But Steves knew of the surname and testified that he was afraid of Shove and that he did not ask Shove whether he was involved in the murders because Steves "did not want to end up like [Hubert]." J.M. told a defense investigator, "I hope, based on what I have said, he doesn't have anybody on the outside that could kill me." Further, witness testimony demonstrates that the alias was part and parcel of Shove's claimed mafia connections, which Shove deployed to persuade and intimidate others.[11] (See *Lee, supra*, 51 Cal.4th at p. 643 [defendant's nickname "Point Blank" was "relevant and extremely probative with regard to the intent with which defendant shot [the victim] and whether the killing was premeditated and deliberate"]; *People v. Allen* (1986) 42 Cal.3d 1222, 1271 [frequent boasts that defendant "previously had, and could then order, people killed," were concededly relevant, and details of defendant's prior

---

[11] Shove contends that the prosecutor only argued in the trial court that Shove used the alias to intimidate, not that it was relevant to prove his state of mind. We understand the prosecution's proffer of intimidation evidence as also relevant to Shove's state of mind. In any event, inapplicable exceptions notwithstanding, "[i]f a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below." (*People v. Brown* (2004) 33 Cal.4th 892, 901.)

criminal acts were "relevant to establishing defendant's identity as the mastermind of the murders and conspiracy and his intent in those crimes"]; *id.* at p. 1272 [it was not misconduct for a prosecutor to discuss defendant's " 'boasts' and 'threats' used repeatedly by defendant to create a mystique to keep those working for him from talking"].)

Shove also argues the probative value of this evidence was substantially outweighed by the risk of undue prejudice. We disagree. We recognize the potential prejudice in that a jury might associate the use of the alias with criminal conduct. (See, e.g., *People v. Pensinger* (1991) 52 Cal.3d 1210, 1253 [recognizing that if a charging document "uses what are obviously criminal aliases . . . without some good reason, there could be prejudicial error"].) But that was precisely Shove's intent in using the alias and underscores its relevance: Shove's use of the name and its association with the mafia evidences an intent to intimidate others into doing what he wanted. Notably, Shove does not challenge the evidence that he claimed mafia connections. To the extent Shove raises concerns that the jury would think he was *actually* connected to an organized crime family, we see no such danger. The jury was aware that detectives found no evidence that Shove was connected to any mafia and the prosecutor made clear that such evidence was not introduced to demonstrate that Shove was actually what he purported to be, but that it was part of his campaign to intimidate and persuade others. The jury was also aware that Shove made other fantastical claims, such as that he was also associated with the Russian and Mexican mafia or was a CIA agent. Thus, there is no substantial likelihood that the jury would have used this evidence for an illegitimate purpose (*People v. Doolin* (2009) 45 Cal.4th 390, 439), and the trial court

did not abuse its discretion in admitting it. (See *People v. Nadey* (2024) 16 Cal.5th 102, 152 (*Nadey*) [in applying Evid. Code, § 352, "prejudicial" is not synonymous with "damaging," and "that evidence, or an inference drawn therefrom, is harmful to the defendant's case does not mean the evidence is unfairly prejudicial"].)

### E. *Batson/Wheeler* Claim

Shove contends that the prosecution improperly exercised peremptory challenges against Black prospective jurors in violation of his state and federal constitutional rights, mandating reversal of his conviction and judgment. The claim fails.

#### 1. Background

During jury selection, after the prosecution exercised its eighth peremptory challenge, Shove's counsel asked to approach the bench. At sidebar, Hardin's counsel made a motion under *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258, stating, "I believe at this point, if my math is correct, in four out of the first six peremptories, the prosecution has exercised — four out of the first six have been [Black]." The court interjected, "I think that they actually exercised eight peremptories," to which Hardin's counsel stated: "I thought — okay. Four out of the first eight then." The court then asked which prosecutor "is going to respond." When one prosecutor stated that she would, the court replied, "Okay."

In response to the motion by Hardin's counsel, the prosecutor began recalling the prosecution's eight peremptory challenges in order: "The first person we dismissed was a Black male. The second I believe was a White female. The third — I am trying to picture these people — this is a woman that,

regarding the death penalty . . . ." Court and counsel confirmed that the prosecutor was referring to Prospective Juror No. 218, a Black female, and the prosecutor then proffered reasons for exercising the challenge. The court stated: "Okay. Next?" The prosecutor then continued to recount the rest of the peremptory challenges chronologically. In this discussion, the prosecutor identified a total of five, not four, Black jurors. When the challenge involved a Black prospective juror, the prosecutor offered explanations for the challenge. The prosecutor never discussed the basis of the first peremptory challenge, which had been made against Prospective Juror No. 206. Shove's counsel did not request reasons concerning Prospective Juror No. 206, nor did Shove's counsel raise any concern with any of the proffered reasons concerning the other jurors.

After the prosecutor finished addressing the eighth peremptory challenge, the court ruled as follows: "I am going to find — I didn't find a prima facie case, and I am not finding a prima facie case. However, I did allow the prosecution to state the reasons for the exercise of the challenges. And I do believe that the reasons that have been indicated for the African/American jurors that have been excused are race-neutral reasons, and I am denying the *Wheeler* motion at this time."

### 2. *Discussion*

"In general, parties may exercise a peremptory challenge ' "for any permissible reason or no reason at all" ' [citations], but the federal and state Constitutions prohibit their use to exclude prospective jurors based on race . . . ." (*Nadey*, *supra*, 16 Cal.5th at p. 124.) The well-established framework for analyzing a *Batson/Wheeler* challenge proceeds in three stages. (*People v. Krebs* (2019) 8 Cal.5th 265, 289 (*Krebs*).) " ' " 'First, the

defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria.  Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge.  Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination.  [Citation.]  "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant]." ' " ' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1088 (*Ramirez*).)

### a.  First or third stage analysis

At the outset, the parties debate whether we should review the trial court's ruling at the first or third stage of the *Batson/Wheeler* analysis.  Much of the parties' debate revolves around whether the trial court solicited explanations for the strikes.  As Shove notes, "[w]hen a trial court solicits an explanation of the strike without first declaring its views on the first stage, we infer an 'implied prima facie finding' of discrimination and proceed directly to review of the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 387, fn. 1 (*Scott*); accord, *People v. Arias* (1996) 13 Cal.4th 92, 135.)  Shove argues that because the trial court did not determine whether the defense had established a prima facie case until after the prosecutor stated the reasons for four of the five strikes, there was an implied prima facie finding and we should therefore treat this as a third-stage case.  The Attorney General, for his part, argues that this case requires a first-stage analysis because the record suggests that the parties believed the purpose of the discussion was to clarify the race and gender of the prospective jurors that had been struck by the

prosecution to that point. In the Attorney General's view, the fact that the prosecutor mentioned reasons for dismissing some of the jurors while clarifying the race and gender of each challenged juror does not transform this into a third-stage case.

So far as the record reveals, the court never solicited reasons from the prosecutor. The record indicates that there was uncertainty over how many peremptory challenges had been exercised against Black prospective jurors. The court asked which prosecutor was "going to respond," at which point one of the prosecutors began to recount the challenges. Partway through the recitation, she began to volunteer the prosecution's reasons for striking the prospective jurors in question. But whether or not the trial court solicited the prosecutor's reasons does not end the inquiry. We have said that when a trial court merely "*listens* to the prosecutor's reasons before purporting to rule on the first-stage inquiry, 'we infer an "implied prima facie finding" of discrimination and proceed directly to review of the ultimate question of purposeful discrimination.' " (*Krebs*, *supra*, 8 Cal.5th at p. 290, italics added; see *People v. Hardy* (2018) 5 Cal.5th 56, 75–76 (*Hardy*); cf. *Scott*, *supra*, 61 Cal.4th at p. 389 ["when the trial court finds there is no prima facie case of discrimination *before* the proponent of the strike . . . has volunteered a statement of reasons, then the appellate court should begin its review with the first-stage ruling" (italics added)].) Here, the trial court received the prosecutor's justifications for the challenges without first declaring its views under the first step of the inquiry; it found no prima facie case only after having permitted the prosecutor to offer reasons for most of the prospective jurors in question.

We have also held that where a trial court finds "that defendant did not make a prima facie showing of group bias and

also . . . passes judgment on the ultimate question of purposeful discrimination, the case is described as a first stage/third stage *Batson*/*Wheeler* hybrid, and the question whether a defendant established a prima facie case of group bias is rendered moot." (*Chism*, *supra*, 58 Cal.4th at p. 1314; see also *Riccardi*, *supra*, 54 Cal.4th at p. 786; *People v. Mills* (2010) 48 Cal.4th 158, 173– 174 (*Mills*).) That appears to be what happened here; the trial court ultimately resolved the *Batson/Wheeler* challenge both by finding no prima facie case and by concluding, after considering the prosecutor's reasons, that discrimination had not been shown. Accordingly, here, for the four challenged jurors for whom the prosecutor proffered justifications, we proceed directly to the third stage of the analysis. Proceeding to this stage does not alter our conclusion that the trial court did not err in allowing the peremptory strikes. (See *Krebs*, *supra*, 8 Cal.5th at p. 290 ["Even were we to assume — as defendant urges — that his challenge has arrived at the third stage, still we would find against him"].)

There is, however, a wrinkle: The prosecutor did not proffer a reason for the first juror excused, Prospective Juror No. 206. In recounting the strikes, the prosecutor began by recalling that her first strike was against a Black male (Prospective Juror No. 206), but she provided no reason for the challenge, nor did the court ask for one, before she continued to recount her challenges. As she continued, the prosecutor began to proffer reasons for striking the prospective jurors in question without having ever volunteered a reason for striking Prospective Juror No. 206, and the trial court generally concluded that there was no prima facie showing in the absence of any justification with respect to Prospective Juror No. 206. And although the court did ultimately receive and rule on the

prosecutor's race-neutral reasons for her other four challenges against Black prospective jurors, that ruling could not have addressed reasons related to Prospective Juror No. 206 because none had been given.  Therefore, none of the reasons why we engage in a third-stage review of the strikes of the other jurors applies in the case of Prospective Juror No. 206.  Under the circumstances, we review the court's denial of Shove's *Batson*/*Wheeler* motion as to Prospective Juror No. 206 as a first-stage denial.  (Cf. *People v. Montes* (2014) 58 Cal.4th 809, 854 (*Montes*) [where court found no prima facie case as to two prospective jurors, analyzing challenge to one juror as a first-stage denial, while analyzing the other at the third stage "out of an abundance of caution, and because the prosecutor proffered race-neutral reasons that the trial court ruled upon"].)[12]

---

[12] Our dissenting colleagues would instead review the denial of the *Batson/Wheeler* motion as to Prospective Juror No. 206 as a third-stage denial.  On their approach, because the prosecutor did not volunteer a reason for striking Prospective Juror No. 206, and because no reason is now likely to be forthcoming some decades later, they would find *Batson/Wheeler* error and reverse the judgment in its entirety.

The dissent's approach starts from the premise that "the trial court's third stage ruling, assuming one occurred, intended to address all targeted jurors despite the fact the prosecution never actually addressed one of the strikes." (Dis. opn. of Evans, J., *post*, at p. 16.)  We cannot agree.  Certainly the trial court's first stage ruling — that no prima facie case had been established — was intended to address all targeted jurors, including Prospective Juror No. 206.  But we consider it unlikely that when the trial court went on to rule on the prosecutor's reasons at the third stage, it intended to rule on reasons the prosecutor had never, in fact, proffered.

### b. *First stage review — Prospective Juror No. 206*

"A prima facie case of racial discrimination in the use of peremptory challenges is established if the totality of the relevant facts ' "gives rise to an inference of discriminatory purpose." ' " (*Scott, supra*, 61 Cal.4th at p. 384.) We review the trial court's first-stage denial "considering . . . whether substantial evidence supports the trial court's conclusion." (*People v. Battle* (2021) 11 Cal.5th 749, 772 (*Battle*).) "We examine the entire record before the trial court to determine whether it supports an inference of such group bias. [Citation.] Certain types of evidence are especially relevant to this inquiry, including whether the prosecutor has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged prospective jurors of that group in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member

---

The dissent also criticizes our citation to *Montes* to support analyzing Prospective Juror No. 206 at the first stage while analyzing the other jurors at the third stage. (Dis. opn. of Evans, J., *post*, at pp. 16–17.) We agree that *Montes* is distinguishable in that there, the trial court appeared to rule that a prima facie case had not been made as to two prospective jurors *before* the prosecutor offered justifications for the strikes. But *Montes* is nonetheless instructive. It addressed a situation where we analyzed the strikes for those two prospective jurors at different stages and determined not to conduct a third-stage analysis with respect to one of the prospective jurors because the prosecutor never provided, and the trial court never ruled on, reasons for striking that prospective juror. (*Montes, supra*, 58 Cal.4th at p. 853.) Similarly here, the trial court never asked for a reason as to Prospective Juror No. 206, the prosecutor never volunteered one, and the court ultimately found no prima facie case.

of the group in which the majority of the remaining jurors belong." (*Id.* at p. 773.)

At the outset, we have previously said that a defendant's race or a case with racial overtones may raise heightened concerns about whether a challenge was racially motivated. (See *Hardy*, *supra*, 5 Cal.5th at p. 78; *People v. O'Malley* (2016) 62 Cal.4th 944, 980–981; *People v. Farnam* (2002) 28 Cal.4th 107, 135–136 (*Farnam*).) Although Shove and the victims are White, which might "lessen[] concerns that the prosecutor had an improper motive for excluding" Black prospective jurors in his case (*Ramirez*, *supra*, 13 Cal.5th at p. 1089), Shove observes that the jury was also being selected for Hardin, who is Black. Although the identity of the victims and the defendants certainly weighs in the analysis, we conclude that the totality of the circumstances supports the trial court's conclusion that no prima facie case of discrimination was established.

"[A]lthough the record here does not disclose the racial or ethnic makeup of the juror pool, nothing suggests the prosecutor ' " 'struck most or all' " ' [citation] of the African-Americans from the venire." (*People v. Taylor* (2010) 48 Cal.4th 574, 615 (*Taylor*).) In fact, the record affirmatively indicates this was not the case. The jury ultimately included five Black jurors, four Asian jurors, two Hispanic jurors, and one White juror. Of the six alternate jurors, three were Black, two were White, and one was Asian. Thus, at the time of the challenged strikes, there were at least eight other Black prospective jurors in the courtroom who were ultimately seated as jurors or alternate jurors.

The prosecution did exercise five of its first eight challenges against Black prospective jurors. But "[w]hile the exclusion rate is important, considered in context it does not

give rise to an inference the excusals were motivated by racial bias . . . ." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 762 (*Holmes, McClain*); accord, e.g., *People v. Streeter* (2012) 54 Cal.4th 205, 223 [three of five peremptory challenges against Black jurors failed to establish a prima facie case]; see also *People v. Clark* (2011) 52 Cal.4th 856, 905 (*Clark*) [prosecutor's peremptory challenges against four of five African-American jurors "[s]tanding alone" failed to raise an inference of discrimination]; *Farnam, supra,* 28 Cal.4th at pp. 136–137 [same].) "We have often underscored that 'ultimate inclusion on the jury of members of the group allegedly targeted by discrimination indicates " 'good faith' " in the use of peremptory challenges, and may show under all the circumstances that no *Wheeler/Batson* violation occurred.' " (*Battle, supra,* 11 Cal.5th at p. 777; see *id.* at pp. 777–778 [same principle applies when jurors are seated as alternates]; *Holmes, McClain,* at pp. 763–764.) Although the inclusion of these jurors on the jury "is 'not conclusive' to our inquiry, because the '[e]xclusion of even one prospective juror for reasons impermissible under *Batson* and *Wheeler* constitutes structural error' regardless of how many other venire members were not so erroneously excluded[,] . . . a prosecutor's acceptance of a jury with members of a group that the prosecutor allegedly discriminated against 'strongly suggests that [bias] was not a motive in his challenge' and, as such, is 'an appropriate factor . . . to consider' in the *Batson/Wheeler* analysis." (*Krebs, supra,* 8 Cal.5th at p. 292; see also *People v. Reed* (2018) 4 Cal.5th 989, 1000–1001 (*Reed*).)

Here, Black jurors were the most represented racial group on the jury, comprising nearly half of all seated jurors. The composition of the final jury tends to dispel any inference of bias that might arise from the pattern of initial strikes. (See *Holmes,*

*McClain*, *supra*, 12 Cal.5th at p. 765 [noting a final jury composition of five Black, five White, and two Hispanic individuals]; *People v. McDaniel* (2021) 12 Cal.5th 97, 124 (*McDaniel*) [final jury composition suggested that the prosecutor did not harbor bias against Black jurors where "[d]espite the relatively high rate of strikes against Black jurors at the time of the motion, the final racial composition of the jury was diverse and contained more Black jurors than jurors of any other race"].) Additional information about the course of jury selection tends to reinforce the conclusion. Of the five seated Black jurors, four were among the first 27 prospective jurors selected for voir dire. Two of those jurors were part of the initial randomly selected 12 prospective jurors and remained in their seats through two rounds of peremptory challenges. (See *Reed*, *supra*, 4 Cal.5th at p. 1000 [record supported trial court's first-stage denial where, inter alia, "the prosecutor first signaled his acceptance of a jury at a time when it contained two [Black] jurors, and three [Black] jurors ultimately sat on the jury"].) When the prosecution exercised its third and fourth peremptory challenges against Prospective Juror Nos. 218 and 202 at issue here, two other seated Black jurors were next in line to replace them. (See *id.* at pp. 1000–1001 ["Most notably, the prosecutor's decision to strike one [Black] juror while accepting another who replaced her suggests that nonrace related differences between the jurors, rather than race, explain the prosecutor's actions"].) The final seated Black juror was among the 15 additional prospective jurors selected for voir dire after the first round of peremptory challenges and replaced a prospective juror excused by the prosecution on the panel of 12 during the second round of peremptory challenges. Immediately thereafter, Hardin's counsel, Shove's counsel, and the prosecution accepted the

panel, and the jury was sworn. Before that, the prosecution accepted the panel three times. When the jury was sworn, the prosecutors had exercised only 12 of their 30 available peremptory challenges. (See Code Civ. Proc., § 231, subd. (a); *McDaniel*, at p. 124 ["[T]he fact that the prosecution accepted a panel with three Black jurors when it had enough remaining peremptory challenges to strike them suggests that the prosecutor did not harbor bias against Black jurors"].)[13]

Shove contends that the prosecutor's failure to provide any reasons for striking Prospective Juror No. 206 "provides strong support that the strike was based on race." But unlike in the

---

[13] The dissent contends "that there exists significant independent support for a prima facie finding of discrimination here," noting the high strike rate against Black prospective jurors, and challenging the reliance on the ultimate composition of the jury, observing that "this postruling information was not before the trial court at the time it made the ruling now under review." (Dis. opn. of Evans, J., *post*, at p. 5, fn. 1.) But our precedent is clear that: (1) though relevant, the strike rate alone does not establish a prima facie case on appellate review, and (2) our review on appeal can properly consider postruling information, including the ultimate composition of the jury, in the totality of the circumstances, even though such information is not generally dispositive. (See *Holmes, McClain, supra*, 12 Cal.5th at p. 761 [50 percent strike rate was "important and reflect an obvious disparity. But, as with most relevant factors, they must be considered in context"]; *People v. Sánchez* (2016) 63 Cal.4th 411, 439 [strike rate of 40 percent, "[c]onsidered alone . . . might suggest a discriminatory purpose, but under the totality of circumstances, they do not"]; *McDaniel, supra*, 12 Cal.5th at p. 124 [final jury composition suggested that the prosecutor did not harbor bias against Black jurors where "[d]espite the relatively high rate of strikes against Black jurors at the time of the motion, the final racial composition of the jury was diverse and contained more Black jurors than jurors of any other race"].)

cases on which Shove relies for this proposition, the prosecutor here did not "decline[]" or "refus[e]" a judge's request to justify her challenges (*Johnson v. California* (2005) 545 U.S. 162, 171, fn. 6), nor did she claim to have no memory of her reasons (see *Paulino v. Harrison* (9th Cir. 2008) 542 F.3d 692, 702–703). Rather, as discussed, the court generally requested a response to the *Batson/Wheeler* motion, and the prosecutor recounted the challenges, beginning with Prospective Juror No. 206; as she continued, she then began volunteering reasons for striking the other jurors. The defense raised no concerns about the omission at the time. Under the circumstances, the prosecutor's omission does not support an inference of bias.

Finally, Shove contends that the prosecutor conducted only desultory voir dire of Prospective Juror No. 206 before striking him; according to Shove, the nature of the voir dire supports an inference of bias. For several reasons, we are unpersuaded. First, where, as here, the attorneys received the jurors' questionnaires prior to commencement of voir dire, "an attorney's failure to engage jurors in voir dire is less significant than when the attorneys know nothing about the jurors prior to striking them. [Citation.] Accordingly, we accord no great weight to the prosecutor's limited voir dire." (*Reed*, *supra*, 4 Cal.5th at p. 1001; see also *Clark*, *supra*, 52 Cal.4th at pp. 906–907 [prosecutor asking few questions before excusing a prospective juror "is of limited significance" when "the prosecutor reviewed the jurors' questionnaire answers and was able to observe their responses and demeanor, first, during extensive individual questioning by the court and later, during group voir dire"].) Moreover, this juror's questioning was not as cursory as Shove contends. The court questioned Prospective Juror No. 206 concerning his death penalty views during death

qualification. During voir dire, this juror had an extensive colloquy with the court concerning a juror's duty not to discuss the case. Shove's and Hardin's counsel thoroughly questioned Prospective Juror No. 206 concerning his prior jury service and his ability to judge the credibility of witnesses and follow jury instructions, and the prosecution questioned him concerning direct and circumstantial evidence.

In sum, substantial evidence supports the trial court's determination that the defense failed to make a prima facie case of racial bias in excusing Prospective Juror No. 206.

Shove acknowledges that he cannot establish, for purposes of mounting a challenge to a first-stage denial, the proportion of Black prospective jurors struck compared to the venire, nor whether the victims are members of the group to which the majority of the remaining jurors belong. He contends that he must be permitted additional factual exploration of these matters if he is to receive effective appellate review. Defense counsel made no effort to create a record of these matters during jury selection. (See *Montes, supra,* 58 Cal.4th at p. 853 ["*Wheeler* requires that the moving party make as complete a record as feasible, and the general rules of appellate review require appellants to demonstrate error"].) But during a postjudgment record correction process while this appeal was pending, the defense moved to settle the race of all prospective jurors by requesting photographs of the seated and prospective jurors from the Department of Motor Vehicles (DMV). The trial court denied that request but, using its trial notes, settled the racial identity of the seated jurors and alternates so a third-stage comparative juror analysis could be attempted. Shove later moved this court to vacate certification of the record or

alternatively to correct, augment, and settle the record, again seeking DMV photographs of the entire venire, which we denied.

Shove now contends that the denial of the request for the DMV photographs has resulted in the denial of meaningful appellate review. We disagree and also deny Shove's request to remand this case to the superior court to augment the record. If there was additional information Shove's counsel wished to adduce in support of the *Batson/Wheeler* motion at trial, it was his responsibility to say so at the time. (See *People v. Griffin* (2004) 33 Cal.4th 536, 554, fn. 4 ["If the record on appeal is inadequate, it is defendant who is responsible, inasmuch as he failed to include in the oral proceedings at trial the information that he improperly sought to insert through a settled statement"]; *People v. Rhoades* (2019) 8 Cal.5th 393, 430, fn. 15 ["it was defendant's burden to make the record necessary to support his [*Batson/Wheeler*] motion" at the prima facie stage].) Shove may, however, present any relevant extra-record materials in support of this claim in a petition for writ of habeas corpus.

### c. Third stage review — Prospective Juror Nos. 218, 202, 215, 7

We then turn to the prospective jurors as to whom the prosecutor did offer reasons. As to Prospective Juror Nos. 218, 202, 215, and 7, engaging in third-stage review means that " 'we must determine whether the trial court correctly ruled that the defense did not demonstrate discriminatory purpose . . . . The prosecutor's justification does not have to support a challenge for cause, and even a trivial reason, if genuine and race neutral, is sufficient. The inquiry is focused on whether the proffered neutral reasons are subjectively genuine, not on how objectively reasonable they are. The reasons need only be sincere and

nondiscriminatory." (*Hardy*, *supra*, 5 Cal.5th at p. 76.) "Comparative juror analysis, comparing questionnaire and voir dire responses of challenged jurors with those of similar jurors from a different racial group, must also be considered upon review of these claims. [Citation.] While not necessarily dispositive, this analysis may offer relevant circumstantial evidence bearing on the genuineness of the prosecutor's race-neutral justifications. [Citation.] Compared jurors need not be identical to challenged jurors in all respects. [Citations.] But '[i]f a prosecutor's proffered reason for striking a [Black] panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination.' " (*Nadey*, *supra*, 16 Cal.5th at p. 126.)

Our cases have held that, in fulfilling its obligation to " 'make "a sincere and reasoned attempt to evaluate the prosecutor's explanation" ' "a "trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.) Instead, where "the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible [citation], and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson*/*Wheeler* motion

denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge." (*Id.* at p. 929; accord, e.g., *People v. Aguirre* (2025) 18 Cal.5th 629, 662 (*Aguirre*).)[14] But "[f]urther inquiry by the trial court may be necessary for a reviewing court to accord deference '[w]hen "the proffered reasons lack[] inherent plausibility or [are] contradicted by the record." ' "" (*Aguirre,* at p. 663.)

Shove argues that we should afford no deference to the trial court's findings in this case because there is no indication that the trial court evaluated whether the prosecutor's volunteered explanations were credible. We disagree. It is true the trial court's comments about the race neutrality of the prosecutor's reasons did not explicitly address the prosecutor's credibility. But it is also true that the defense in this case did not dispute the factual bases or sincerity of any of the

---

[14] Shove argues that this approach is at odds with high court rulings issued after *Reynoso,* pointing to the comparative juror analyses conducted in *Miller-El v. Dretke* (2005) 545 U.S. 231, 241–252 (*Miller-El*) and *Snyder v. Louisiana* (2008) 552 U.S. 472, 483–484 as demonstrating the careful analysis of all relevant circumstances trial courts must apply at the third stage. But as Shove acknowledges, the high court in *Miller-El* and *Snyder* did not establish any rules regarding the obligations of a trial court in making a third-stage finding and the deference owed thereto. Shove provides no persuasive reason to reconsider our established precedent on this point.

We note that Code of Civil Procedure section 231.7, subdivision (d)(1), as added by Assembly Bill No. 3070 (2019–2020 Reg. Sess.), now requires a trial court to explain the reasons for its ruling to an objection to a peremptory challenge on the record. This statute applies only to trials in which jury selection began on or after January 1, 2022, and so the requirement is not at issue here. (Code Civ. Proc., § 231.7, subd. (i).)

prosecutor's reasons, and, as explained below, the record raises no significant questions in that regard. (See *People v. Baker* (2021) 10 Cal.5th 1044, 1078–1079.) The trial court's comments, though quite brief, were comparable to those in other cases that we have understood as implicitly ruling on the prosecutor's credibility. (See, e.g., *Aguirre*, *supra*, 18 Cal.5th at pp. 664–665 ["Given its natural meaning and viewed in context, the trial court's ruling that '[t]he question is whether or not there are any race neutral grounds, and there appear to be race neutral grounds,' . . . reasonably reflected a finding that the prosecutor was credible and that her peremptory challenge was not motivated by discriminatory intent."]; *People v. Mai* (2013) 57 Cal.4th 986, 1047 (*Mai*) [reaching similar conclusion where the trial court said " 'that no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral, and on those grounds the court will deny the *Wheeler* motion' "].) In any event, this is not a case that rises or falls on the degree of deference we accord to the trial court's third-stage ruling; even if we were to conclude that the trial court's ruling is entitled to no deference, we would still conclude that no *Batson/Wheeler* error has been established on this record.[15]

---

[15] Relying on the United States Supreme Court's recent decision in *Pitchford v. Cain* (2026) ___ U.S. ___ [146 S.Ct. 1345] (*Pitchford*), the dissent asserts that the trial court failed to make a complete third-stage ruling, and that the judgment should be reversed on that basis. (See dis. opn. of Evans, J., *post*, at pp. 2–3, 6, 8–15.)

Shove himself has not raised *Pitchford*, and this case does not resemble it in any event. In *Pitchford*, the issue was whether the defendant "had waived his opportunity to rebut the prosecutor's race-neutral reasons as pretextual at *Batson*'s third

step." (*Pitchford, supra*, ___ U.S. at p. ___ [146 S.Ct. at p. 1349].) In holding that the defendant had preserved his pretext objection, the high court observed that "defense counsel must at least have an opportunity to argue that the [prosecutor's] asserted race-neutral reasons" were pretextual, but in that case, "whether due to confusion, oversight, an overly hurried jury selection process, or some other cause, things broke down, and the ordinary trial-court procedure for resolving *Batson* claims at step three never occurred — notwithstanding the repeated efforts of Pitchford's counsel to pursue and preserve the *Batson* objection." (*Id.* at p. ___ [146 S.Ct. at p. 1353].)

*Pitchford* is inapplicable, first of all, because waiver is not at issue here. (Accord *Pitchford, supra*, ___ U.S. at p. ___ (dis. opn. of Gorsuch, J.) [146 S.Ct. at p. 1358] ["the Court issues a narrow judgment, holding only that Mr. Pitchford did not waive a step three *Batson* argument"].) And, to the extent *Pitchford* can be read as commenting on a trial court's duties at the third stage of the *Batson/Wheeler* inquiry, its commentary addresses circumstances not present in this case. In *Pitchford*, after ruling that the prosecutor's reasons were race-neutral, the trial court launched into other court business; when defense counsel later sought to raise the *Batson* issue again at the close of jury selection, "the trial court twice cut off defense counsel and ended the inquiry before counsel could try to rebut as pretextual the race-neutral reasons articulated by the prosecution . . . ." (*Pitchford, supra*, ___ U.S. at p. ___ [146 S.Ct. at p. 1350].) Defense counsel also filed a motion for a new trial "advanc[ing] the argument that he was prevented from making during jury selection — that the prosecutor's stated reasons for the peremptory challenges were pretextual." (*Ibid.*)

Here, by contrast, the trial court concluded both that no prima facie case had been established and, recognizing that it had permitted the prosecutor to offer reasons as to some of the jurors, that those reasons were race-neutral, such that the *Batson/Wheeler* motion would be denied. In the face of this ruling, the defense remained resolutely silent — never attempting to rebut, either during jury selection or afterwards, the prosecution's justifications for the strikes. (Cf. *Mai, supra*,

### (1) Prospective Juror No. 218

We begin with the first prospective juror struck by the prosecution, Prospective Juror No. 218. The prosecutor said she

_____

57 Cal.4th at p. 1049, fn. 26 ["the burden is always on the party claiming discrimination to establish it"].) Unlike in *Pitchford*, there is no indication that the trial court in any way " 'thwarted' " or "prevented" counsel from raising any such concerns. (*Pitchford, supra,* ___ U.S. at pp. ___, ___, fn. 3 [146 S.Ct. at pp. 1351, 1352, fn. 3].) The mere fact that the trial court moved forward with jury selection after ruling on the *Batson*/*Wheeler* motion is hardly surprising and does not evidence the kind of procedural breakdown that concerned the court in *Pitchford*. (Cf. *id.* at p. ___ [146 S.Ct. at p. 1353].)

The dissent contends that the trial court's remark that the proffered justifications were "race-neutral" failed to make a complete third stage finding because the trial court did not determine that the prosecution's nondiscriminatory reasons were genuine. (Dis. opn. of Evans, J., *post,* at pp. 2–3, 7.) But our precedent recognizes that trial courts have frequently used the term "race neutral" as a shorthand for the conclusion that the striking party's actual reasons for striking the juror were not racially discriminatory. (See *Aguirre, supra,* 18 Cal.5th at pp. 664–665.) *Pitchford* demonstrates that a finding that reasons are "race neutral" does not *always* reflect careful consideration of the ultimate issue under *Batson*. On this point, we agree with the dissent. (Dis. opn. of Evans, J., *post,* at p. 14.) But nothing in *Pitchford* calls into question the proposition that the phrase "race neutral" often is, in fact, used to convey that the trial court has not been persuaded that the striking party's actual reasons were racially discriminatory. In *Pitchford*, the trial court could not have reached that conclusion, because it had not given the defense the opportunity to present available pretext arguments at *Batson*'s step three. But the same is not true here. Given that the defense in this case made no effort, at any time, to argue pretext to the trial court, we see no reason to doubt that when the trial court ruled on the prosecutor's reasons in denying Hardin's *Batson / Wheeler* motion, it intended to, and did, issue a third-stage ruling on the ultimate issue of discrimination.

challenged Prospective Juror No. 218 because: "On the questionnaire she indicated, regarding the death penalty, that she was not sure if we should have the death penalty. She also said she would have problems regarding her religious beliefs. She also said that she would pray for direction from God regarding the verdict in this case and regarding what she would do. She also indicated numerous contacts in terms of people incarcerated. Her nephew did a robbery with a gun . . . her niece was murdered by a boyfriend. And she, today, when questioned by the defense, said she did not want to sit as a juror; that it would be too long, and that she didn't want to see the pictures. We didn't feel like she was going to be able to impose the death penalty if she thought it was right, based on her answers. And we also felt that she would have a bias against law-enforcement for some of her contacts with police over the years."

The record supports the prosecutor's reasons relating to the death penalty. (*Hardy*, *supra*, 5 Cal.5th at p. 79.) When asked on the questionnaire whether she believed California should have the death penalty, Prospective Juror No. 218 did not indicate either "yes" or "no" but wrote: "I am not sure if anyone should have the death penalty." As to whether she would be able to vote for the death penalty if she believed it appropriate, she answered "yes," but explained, "I could say yes but it would be a hard thing to do — having 11 others in agreement will help." When asked whether she had any religious beliefs which would make it difficult or impossible for her to return a verdict of death, she answered "yes," and explained, "[m]y religious beliefs would compel me to pray about this person and ask God for direction." During the death qualification process, the court asked whether she would "expect to get some kind of communication through prayer as to how you

should make your determination in this case," to which Prospective Juror No. 218 responded, "Yes, I would expect it." When pressed by the court whether she would base her decision on the evidence and instructions or prayer, Prospective Juror No. 218 stated that she "would be looking at the evidence that's presented . . . but I would be praying about the whole trial." She later stated, however, that she could vote for the death penalty.

"A juror's reluctance to impose the death penalty has long been considered a legitimate, race-neutral basis for excusal in a capital case," and "[w]e have repeatedly upheld peremptory challenges to jurors whose reservations about the death penalty are religious in nature." (*People v. Winbush* (2017) 2 Cal.5th 402, 436 (*Winbush*); see also *Montes, supra,* 58 Cal.4th at p. 856 [peremptorily challenging prospective jurors with religious views "that make it difficult for them to impose the death penalty" is proper].) Although Prospective Juror No. 218's questionnaire indicated that she might be able to vote for the death penalty, " 'neither the prosecutor nor the trial court [i]s required to take the jurors' answers at face value,' " and "[i]f other statements or attitudes of the juror suggest that the juror has 'reservations or scruples' about imposing the death penalty, this demonstrated reluctance is a race-neutral reason that can justify a peremptory challenge, even if it would not be sufficient to support a challenge for cause." (*People v. Lomax* (2010) 49 Cal.4th 530, 572 (*Lomax*).)

Additionally, as the prosecutor noted, Prospective Juror No. 218 stated in voir dire that she did not want to sit on the jury because the trial would be too long and "I just don't really want to hear all the details, and I don't want to have to look at pictures and that type of thing." She later confirmed that she was "a little bit uncomfortable" but could perform her obligation

as a juror if she had to.  Although not wanting to sit as a juror on the case would be "a rather weak reason" in isolation, "it does not stand alone" and was a legitimate race-neutral reason "to add to the others."  (*Hardy*, *supra*, 5 Cal.5th at p. 82.)

Shove argues that because Prospective Juror No. 218's questionnaire reflected no contacts with law enforcement, there was no support for the prosecutor's final reason for striking her. We disagree with the premise:  Prospective Juror No. 218 said on her questionnaire and on voir dire that her niece had been murdered by a boyfriend and her nephew had been imprisoned for armed robbery.  The prosecutor's statement referring to Prospective Juror No. 218's law enforcement contacts can fairly be read as a reference to these experiences, through family members, with the criminal justice system.  (See *Nadey*, *supra*, 16 Cal.5th at p. 141 [noting that this court's case law has regarded "[a] close relative's negative contact with the criminal justice system" as a "race-neutral basis for excusal"].)

One might reasonably question whether these contacts, without more, constituted adequate support for the prosecutor's concern that Prospective Juror No. 218 might have a bias against law enforcement.[16]  But even if there was a deficiency in

---

[16]  Code of Civil Procedure section 231.7, as added by Assembly Bill No. 3070 (2019–2020 Reg. Sess.), presumes invalid a peremptory challenge exercised because, inter alia, a prospective juror "[e]xpress[ed] a distrust of or ha[d] a negative experience with law enforcement or the criminal legal system," or had "a close relationship with people who have been stopped, arrested, or convicted of a crime."  (Code Civ. Proc., § 231.7, subd. (e)(1), (3).)  But again, this statute is inapplicable to this case, as it applies only to jury selection proceedings after January 1, 2022.  (*Id.*, subd. (i).)

this respect, this was one of a number of reasons, and the prosecutor did not place any special emphasis on it; the prosecutor mentioned this concern only after mentioning their concern that Prospective Juror No. 218's religious and other beliefs would prevent her from voting for the death penalty if the evidence warranted it. The trial court's task was to " 'evaluate the attorney's statement of reasons as a whole rather than focus exclusively on one or two of the reasons offered.' " (*Nadey*, *supra*, 16 Cal.5th at p. 137.) For reasons already explained, the reasons, as a whole, do not suggest that the prosecutor struck Prospective Juror No. 218 because of her race.

Comparative juror analysis does not compel a different conclusion. Shove points to Juror No. 2 and Alternate Juror No. 3, each of whom also knew people who had negative experiences with law enforcement. Single-issue comparisons among jurors "are not necessarily dispositive on the issue of purposeful discrimination but rather, must be considered within all of the relevant circumstances." (*Miles*, *supra*, 9 Cal.5th at p. 543, fn. 9.) "Although jurors need not be completely identical for a comparison to be probative [citation], 'they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge.' " (*Winbush*, *supra*, 2 Cal.5th at

Notwithstanding the Legislature's determination that such reasons are now to be treated as presumptively, but not conclusively, invalid, we decline Shove's invitation to apply such a presumption retroactively to this case or reconsider our precedent. The Legislature clearly stated the statute would apply prospectively only and our precedent in this area informed the parties' positions and arguments below.

p. 443.)[17]  Unlike Prospective Juror No. 218, Juror No. 2 and Alternate Juror No. 3 indicated no religious reservations about the death penalty and were otherwise unequivocal about their ability to impose it.  As such, these empaneled jurors had materially different responses concerning the death penalty than Prospective Juror No. 218, and "[a] prosecutor need not strike every single juror with a particular trait, even those with other redeeming qualities, to demonstrate that concerns about the trait are genuine." (*Armstrong, supra*, 6 Cal.5th at p. 780.)

Shove also contends that several non-Black seated jurors also expressed noncommittal views regarding the death penalty. But none of these jurors expressed any religious scruples with the death penalty that would make it difficult or impossible for

---

[17]  We reject Shove's contention that this approach is in tension with the high court's approach in conducting comparative juror analysis.  (See *Winbush, supra*, 2 Cal.5th at pp. 490–491 (conc. opn. of Liu, J.).)  Although the high court has rejected "a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects" (*Miller-El, supra*, 545 U.S. at p. 247, fn. 6), that does not mean we must conclude there is error whenever a seated juror shares a characteristic with an excused prospective juror regardless of their other responses.  (See *Miles, supra*, 9 Cal.5th at p. 543 [" When a prosecutor states multiple reasons for challenging a juror, a comparison between the challenged juror and a similar nonchallenged juror in regard to *any one of* the prosecutor's stated reasons is relevant, but not necessarily dispositive, on the issue of purposeful discrimination"].)  Indeed, as the high court observed, "potential jurors are not products of a set of cookie cutters" (*Miller-El*, at p. 247, fn. 6), and as we have noted, "[o]verlap on one concern will seldom be sufficient:  'Two panelists might give a similar answer on a given point.  Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 784–785 (*Armstrong*)).

them to return a death verdict. Although she ultimately stated that she would be able to vote for death, Prospective Juror No. 218 repeatedly referenced her religious beliefs as causing hesitation. These responses are not comparable to those of the identified seated jurors. (See *Miles, supra,* 9 Cal.5th at p. 544 [in determining whether there were material differences among the jurors, differences "generally will be more probative if they closely relate to reasons the prosecutor has stated for a peremptory challenge"].)

### (2) Prospective Juror No. 202

The prosecutor stated that Prospective Juror No. 202 was excused because "her brother was actually given a lethal injection and killed basically through the death penalty in Texas. I frankly don't believe that — even though she said she could be fair, that having someone so close to her, a brother, an actual brother, sibling, being injected and killed, that when it comes down to it, that she could be fair. I don't think she would give the prosecution equal weight in terms of considering penalty."

The prosecutor's reasons were supported by the record. Prospective Juror No. 202 stated on her questionnaire that her brother had been arrested for robbery and murder and was executed in Texas by lethal injection. Prospective Juror No. 202 had visited her brother while he was in custody. On voir dire, Prospective Juror No. 202 stated that she was close to her brother but believed she could be fair to both sides in the case.

Shove contends that the prosecutor's justification was a "demeanor-based reason," and that in the absence of an explicit ruling by the trial court, it cannot be presumed that the judge credited the assertion. We see nothing in the prosecutor's

reasoning that referenced Prospective Juror No. 202's demeanor. And although Prospective Juror No. 202 indicated she would be able to vote for death, the prosecutor was not required to take her answer at face value (*Lomax*, *supra*, 49 Cal.4th at p. 572), especially when confronted with a prospective juror who had a close family member who was subject to capital punishment. The prosecutor's concern about Prospective Juror No. 202's ability to impose the death penalty, given that experience, was a nondiscriminatory reason for exercising the challenge. (See *Miles*, *supra*, 9 Cal.5th at p. 546 [" 'A prospective juror's views about the death penalty are a permissible race- and group-neutral basis for exercising a peremptory challenge in a capital case' "].)

Shove contends that "the prosecution's reasons show that racial stereotyping was on the prosecution's mind when exercising peremptory challenges" because "[t]he prosecution took pains to explain that the juror had an 'actual brother' who was executed, as opposed to the term 'brother' as used colloquially as a member of the African-American race." But as far as the record reveals, the prosecutor's comment simply emphasized that Prospective Juror No. 202 "actually" had a sibling who was executed, in order to explain why the prosecutor had trouble believing that the prospective juror could be fair in determining penalty. The comment does not suggest that the concern was a pretext for discrimination.

Comparative juror analysis does not assist Shove. Shove points to Juror No. 2, who visited his partner in jail after he had been arrested for driving under the influence and a probation violation. He also notes that Alternate Juror No. 3 picked up his brother-in-law from jail, whom he may not have considered a close friend or relative considering he answered "no" when

asked whether a close friend or relative had ever been arrested for a crime. These jurors' experiences are markedly different than visiting a sibling who had been convicted of murder, sentenced to death, and ultimately executed. The prosecutor's reasons do not evidence a discriminatory purpose.

### (3) Prospective Juror No. 215

As to Prospective Juror No. 215, the prosecutor explained: "He visited his son in custody. When he was asked by [the other prosecutor] about that, he said the case was dismissed. His nephew was also arrested, and he didn't think that the police did a good job. He put that in his questionnaire, and he reiterated it today in open court. He also said officers are capable of lying. He also, regarding the death penalty, said, 'Hopes it won't be a problem at the time.' I thought he was a little noncommittal on that, even though he probably later said it was fine. Anybody who kind of hesitated, we are skeptical of." Finally, the prosecutor said: "[H]is son was arrested, and it is only three years ago that he visited him in custody. And he said the case was dismissed, which would leave me to believe that he felt his son was in for something he didn't do or wasn't warranted. That would give him the police bias."

Prospective Juror No. 215 stated in his questionnaire that he had visited his son in custody and explained at voir dire that his son had been arrested for possessing a weapon but that the matter was dismissed. Prospective Juror No. 215 also stated on his questionnaire that his nephew had been recently arrested, and though he did not know much about the case, "[f]rom what I know, they didn't do a good job." In voir dire, Prospective Juror No. 215 confirmed that he did not believe the police conducted a good investigation, and when asked whether it would cause him

to doubt the police or prejudge this case, he stated, "I wouldn't say it would cast doubts or — I would say it goes back to the statement that was made earlier; that . . . even the police officer is capable of lying or . . . not being truthful."

Although statutory law prospectively treats reasons relating to negative experiences and/or views of law enforcement as presumptively invalid and thus requiring further inquiry to support a peremptory strike (see Pen. Code, § 231.7, subd. (e); fn. 16, *ante*), our *Batson/Wheeler* cases have held that a close relative's adverse experiences with the criminal justice system is a race-neutral basis for excusal. (*Nadey*, *supra*, 16 Cal.5th at p. 141.) Although Prospective Juror No. 215 said that nothing about his son's adverse experience with the criminal justice system would cause him to be unfair, that does not controvert the genuineness of the prosecutor's concerns about the effects of that experience on the prospective juror. (See *Hardy*, *supra*, 5 Cal.5th at p. 82 [it was reasonable for the prosecutor to be concerned about a prospective juror who had been falsely arrested "regardless of how understanding and forgiving that juror might appear to be"]; see also *Mills*, *supra*, 48 Cal.4th at p. 176 [justification for exercising peremptory challenge need not support a challenge for cause].) Prospective Juror No. 215 also did not believe that the police investigating his nephew's case had done a good job and this adverse experience had impressed upon him that police, like anyone else, could lie. There is no apparent reason to question whether the prosecutor's concerns about these responses were genuine.

With respect to the reasons relating to his death penalty views, Prospective Juror No. 215 wrote on his questionnaire that his views on the death penalty "[p]resently" aligned with "[t]hose who believe that the death penalty is appropriate in

certain cases and would carefully consider all the evidence and instructions of the court in deciding whether the death penalty was the appropriate penalty in this case."[18]  Though jurors in this category could return either penalty verdict depending upon which they believed to be appropriate, Prospective Juror No. 215 added, "I only hope it won't be a problem at the time for that decision to be made."  When asked whether there was any reason why he would rather not sit as a juror on a death penalty case, Prospective Juror No. 215 answered, "yes," and explained, "I don't know if I would be able to — Presently I believe I would." Prospective Juror No. 215 also answered "don't know" as to whether he had any objections to the death penalty which he believed might impair his ability to be fair and impartial in a death penalty case.  Thus, notwithstanding any neutrality Prospective Juror No. 215 expressed on the death penalty, his other statements suggesting " 'reservations or scruples' about imposing the death penalty" provided a race-neutral reason

---

[18]      Question 60 on the questionnaire provided that "[m]any people's views about the death penalty fall into <u>one of four groups</u>:  (1) Those who would <u>automatically vote for death</u>, without regard to aggravating and mitigating factors . . . ; (2) Those who would <u>automatically vote for life in prison without parole (LWOP)</u>, without regard to aggravating and mitigating factors . . . ;  (3) Those who <u>agree there should be a death penalty</u>, but who know that they <u>would never be able to personally vote for death</u>, without regard to aggravating and mitigating factors . . . ; (4) Those who believe that the <u>death penalty is appropriate in certain cases</u> and <u>would carefully consider all the evidence and instructions of the court in deciding whether the death penalty was the appropriate penalty in this case</u>.  Jurors in this category would return a verdict of death" or "life without the possibility of parole . . . if they believed that was the appropriate penalty."

justifying the peremptory challenge.  (*Lomax*, *supra*, 49 Cal.4th at p. 572.)

Shove argues that Prospective Juror No. 215 was never asked about his ability to impose the death penalty on voir dire. But the prospective jurors had already been questioned about their views on the death penalty during the death qualification process; at the outset of regular voir dire, the trial court had made clear that they would not be questioned further on the subject.  Moreover, the court and prosecutor did question Prospective Juror No. 215 about his questionnaire responses during the death qualification process.  He indicated he could vote for death yet was concerned about how he would "be able to live with that decision."  Nothing about the nature of the questioning, nor Prospective Juror No. 215's responses, calls into question the genuineness of the prosecutor's concern about the prospective juror's ability to return a death verdict if the evidence warranted it.

Also, that the prosecutor noted that Prospective Juror No. 215 was "a man [who] had a slight Jamaican accent" before recounting the reasons for exercising the challenge does not, as Shove argues, call into question the race-neutral reasons the prosecutor provided in exercising the peremptory challenge.  We read the prosecutor's comment as recalling the identity of the excused prospective juror, as she did with the other jurors.

Finally, comparative juror analysis again falls short of demonstrating pretext.  Although, as noted, Juror No. 2 and Alternate Juror No. 3 also both knew people who were in jail, both expressed little or no knowledge or opinions of those proceedings.  By contrast, Prospective Juror No. 215 did not believe that the police investigating his nephew's case had done a good job and the experience impressed upon him that police

could lie. Prospective Juror No. 215 visiting his son in jail for a matter that was ultimately dismissed further raised concerns about Prospective Juror No. 215's potential bias against law enforcement in a different manner than the identified empaneled jurors' experiences.

Shove also argues, as he did in connection with Prospective Juror No. 218, that other non-Black jurors expressed similarly noncommittal views regarding the death penalty. The record does not support the contention. Shove notes that Juror No. 2 answered on his questionnaire that he was neither for nor against the death penalty and that "it is what it is." But expressing neutrality on the existence of the death penalty is different than expressing concern about being able to vote for the death penalty, and Juror No. 2's questionnaire and death qualification responses reveal no such hesitancy. Additionally, Shove has not shown that Juror No. 2 had similar negative experiences with law enforcement, therefore Juror No. 2 is also materially different from Juror No. 215 regardless of any similarities on their death penalty views. (See *Miles*, *supra*, 9 Cal.5th at p. 544.)

As to Juror No. 3, this juror wrote on his questionnaire that the "[d]eath penalty will not bring the victim back life without parole is worse than death penalty." In response to whether he believed California should have the death penalty, Juror No. 3 answered "no" and referred to his previous answer in explaining, "the victim will never come back." He also answered "don't know" in response to questions asking whether he would be able to vote for the death penalty if he believed, after hearing all the law and evidence, that the death penalty was appropriate, and whether he had any objections to the death penalty that might impair his ability to be fair and impartial.

When asked about these "don't know" responses during death qualification, Juror No. 3 explained: "Well, the death penalty somehow is a relief to the victim's family. The victim is already gone. He is dead. And the defendant is the one who did that crime." When the trial court explained that California law considers death to be the more severe punishment, monetary costs are not an appropriate consideration, and that either punishment would be carried out, Juror No. 3 protested, "But it takes twenty years until the accused is put to death." The trial court explained that was a factor not to be considered.

Prospective Juror No. 215 and Juror No. 3 both noted uncertainty about whether they could actually vote for death, and both indicated on their questionnaires that their death penalty views fell into group four — those who believe the penalty is appropriate in certain cases and would carefully consider all the evidence and instructions of the court in deciding whether the death penalty was the appropriate penalty. But, unlike Prospective Juror No. 215, Juror No. 3 did not state he would prefer to not sit as a juror on a death penalty case. And unlike Prospective Juror No. 215, who was worried if he could "live with [the] decision" of selecting the punishment of death, Juror No. 3's responses revealed no moral qualms about the death penalty or that he struggled with the weight of the decision. Rather, his responses evidence concerns with the practicality or utility of the death penalty. Even assuming some similarity between the death penalty views of Prospective Juror No. 215 and Juror No. 3, they are not comparable for other reasons. For instance, regarding suspicion of law enforcement, Juror No. 3, unlike Prospective Juror No. 215, stated he would consider the testimony of a peace officer more believable than other witnesses' testimony because a peace officer "swears to do

his duty and to tell the truth regardless." (See *Nadey*, *supra*, 16 Cal.5th at pp. 141, 143 [compared jurors were more favorable to the prosecution]; see also *Miles*, *supra*, 9 Cal.5th at pp. 542–543.)

Shove also points to Juror No. 6, who appears to have initially answered "don't know" in response to the question asking whether she would be able to vote for the death penalty if she believed it appropriate, but then struck that response and answered "yes," explaining, "[i]t's hard to come up with such decision." Juror No. 6 said her views on the death penalty aligned with those described in group four in the questionnaire and explained during death qualification: "Actually at the time that I filled out the questionnaire[], I [was] . . . in between three and four. I would feel guilty for voting . . . responsible for voting [for the] death penalty or life in prison for someone. But when I think about it, . . . as a jury, it is a duty to make that decision based on the facts. So I [chose] number four . . . ." She also explained, "when I said difficulty, I just want to clarify, . . . after the trial is over, how it will affect me. But I could make that decision[]." She said that this concern would not affect her decision.

Juror No. 6's responses are similar to Prospective Juror No. 215's in that both expressed concern as to how making the penalty determination might be difficult. But Juror No. 6 had an otherwise favorable view of the death penalty, stating on her questionnaire she believed California should have the death penalty "[t]o further enforce the laws" and that she thought it was "fair and square." Moreover, unlike Prospective Juror No. 215, Juror No. 6 did not express uncertainty over whether she had any objection to the death penalty that would impair her ability to be fair and impartial and said there was no reason

why she would rather not sit as a juror on a death penalty case. Accordingly, notwithstanding any concern about how the penalty decision might weigh on her in the future, Juror No. 6 did not express any inability to make that decision.

Nor is Juror No. 8 an apt comparison. Shove notes that Juror No. 8 answered "no comment" on her questionnaire when asked about her general feelings about the death penalty. When asked whether she would be able to vote for the death penalty if she believed it appropriate, Juror No. 8 answered "don't know" and explained, "I would have to hear all facts, and really think about it." In stating that her views aligned with those in group four, she explained, "I would really have to think about my verdict carefully befor[e] I would reach my decis[]ion." During death qualification, Juror No. 8 explained that she had never had to think about making such a decision before and how after completing her questionnaire she spent the weekend "really thinking about it," explaining the situation "was weighing pretty heavy over my head." But following reflection, Juror No. 8 stated that if "I had to make the decision, I could do it" and in fact she was "certain [she] could do it." Unlike Prospective Juror No. 215, Juror No. 8 did not express moral qualms but an initial lack of an opinion on a weighty matter that she resolved. "An advocate is entitled to consider a panelist's . . . acceptance of responsibility for making weighty decisions." (*People v. Lenix* (2008) 44 Cal.4th 602, 623.) Also, unlike Prospective Juror No. 215, Juror No. 8 stated no uncertainty over whether she had any objections to the death penalty that would impair her ability to be fair and impartial and no reason why she would rather not sit as a juror in a death penalty case.

Finally, Shove points out that Juror No. 9 answered "don't know" in response to the question asking whether she had any

objections to the death penalty that would impair her ability to be fair and impartial, explaining that the "[d]eath penalty is applicable depending on [a] case to case basis." But this indicates only that Juror No. 9 would not automatically vote for or against death and would undertake an individualized assessment before deciding the penalty. Juror No. 9 otherwise expressed no hesitancy in making the penalty decision and stated on her questionnaire that she was neutral on the death penalty and would not have "difficulty" doing "what's required by law." She believed that California should have a death penalty, explaining that "[u]nnecessary crimes have been committed [and the] death penalty can be one of the ways to clean up the community." Juror No. 9 also stated that she would be able to vote for the death penalty if it was appropriate, explaining, "[i]f all evidence[] [is] presented, will not hesitate to go along [with the] death penalty." Such responses contrast with Prospective Juror No. 215's "hope it won't be a problem at the time for that decision to be made." Juror No. 9 also stated no reason why she would rather not sit as a juror in a death penalty case.

Accordingly, comparing the identified seated jurors' responses to the reasons for the excusal of the challenged prospective juror does not demonstrate that they are " 'materially similar in the respects significant to the prosecutor's stated basis for the challenge' " so as to be probative. (*Winbush*, *supra*, 2 Cal.5th at p. 443.)

### (4) Prospective Juror No. 7

The prosecutor stated she excused Prospective Juror No. 7 because: "She originally wrote on her questionnaire that she was a three," i.e., that her views on the death penalty aligned

with those who agree with the death penalty but could never personally vote for death. "When she was questioned by the court, she said that she could do it. However, she wrote in her questionnaire that she was unsure. And she also wrote, 'to have someone's life in your hands.' Her son was arrested for drugs. And we just thought that she was not strong on the death penalty in terms of being able to truly do it. Because when someone writes a three on their questionnaire, they have had time to think about it. That's really what they are writing. I think they feel pressure when they are being asked in open court to go along with the rest and sound strong and say they could actually do it."

Prospective Juror No. 7 stated on her questionnaire that her views on the death penalty aligned with those in the group "who agree there should be a death penalty, but who know that they would never be able to personally vote for death . . . ." As to whether there was any reason she would rather not sit as a juror on a death penalty case, Prospective Juror No. 7 answered "yes," explaining, "As I said before this is a hard decision to make because you have someone's life in your hands." When the prosecutor questioned Prospective Juror No. 7 about these responses during the death qualification process, Prospective Juror No. 7 stated that, "after hearing all the conversations and the things that you've been presenting, I feel that . . . after presented with all the facts and evidence . . . that I could be . . . a fair juror. And . . . if we had to go to deliberation and all that, I could vote what was right." When pressed on the issue of whether she could impose the death penalty if she felt it appropriate, Prospective Juror No. 7 responded, "Yeah, it will be hard, but I feel I could." During voir dire, Prospective Juror No. 7 was questioned about being the victim of a residential

burglary and said that it would not affect her in this case. Prospective Juror No. 7 also stated on her questionnaire that her son had been arrested for selling drugs.

The prosecutor's reasons for exercising the challenge are plausible and supported by the record. Prospective Juror No. 7 stated on her questionnaire that she would never be able to personally vote for death. Although she later expressed ambivalence about this position during the death qualification process, the prosecutor's concern that Prospective Juror No. 7 might have merely conformed with other prospective jurors' responses in open court was legitimate and race-neutral. (*Winbush*, *supra*, 2 Cal.5th at p. 436.) Shove contends that the prosecutor failed to adequately question Prospective Juror No. 7 regarding this reason for excusal, but the record shows this prospective juror was questioned about her death penalty views during the death qualification process and, as with other prospective jurors, Prospective Juror No. 7 was not questioned again about the death penalty during voir dire.

Nor does comparative juror analysis persuade us to a different conclusion. As before, although Juror No. 2 and Alternate Juror No. 3 also knew people who had been arrested, the combination of the seated jurors' responses were materially different from Prospective Juror No. 7's. (See *Miles*, *supra*, 9 Cal.5th at pp. 543–544.) As noted, Juror No. 2 and Alternate Juror No. 3 expressed no hesitation about their ability to vote for the death penalty. Nor did any of the jurors that Shove identifies state that their views about the death penalty aligned with the third group on the questionnaire, or that they would rather not sit on a death penalty case. Consequently, there are material differences, other than race, that we can reasonably infer motivated the prosecutor's challenges. (*Id.* at p. 550.)

## III.    GUILT PHASE ISSUES

### A. Denial of Shove's Request to Impeach Kenneth with Inconsistent Statements

Shove contends the trial court improperly restricted his ability to impeach Kenneth with statements he had made to his wife, on the ground that the statements were privileged marital communications. Shove argues that the trial court's ruling violated his statutory and constitutional rights. We conclude that any error was harmless.

#### 1. Background

At trial, Kenneth testified that he did not know Monte Proulx and had never met or heard his name before this case. Kenneth denied attending an auction with Proulx in 2001 or telling his wife that he had recently met a man named Monte at an auction who worked for Jack Reiland and found him to be very strange.

Shove's counsel then sought to call Kenneth's wife, Allison, to testify concerning a 2004 interview with detectives in which she stated that Kenneth told her he had recently attended an auction and met a very strange person named Monte. Shove's counsel argued that Allison's testimony on this point was admissible as a prior inconsistent statement by Kenneth; the prosecution claimed, however, that the testimony was irrelevant because it referred to a different incident than that covered by Kenneth's testimony and that it was otherwise excludable under the marital communication privilege. Shove's counsel contended that the privilege was waived but acknowledged that both spouses hold the privilege and that the defense is "calling her to impeach [Kenneth] who would say that my wife can't testify."

At an Evidence Code section 402 hearing, Allison remembered being interviewed by detectives in 2004 and that her husband had attended an auction after Vann left Cal Aero, but did not remember telling the detectives that Kenneth told her that he had recently met a man named Monte at an auction. Instead, during a private conversation in their bedroom, Kenneth told her someone had pointed out Reiland to him at an auction. Given Allison's testimony, Shove's counsel intended to call the interviewing detectives to testify to Allison's statement and argued that Allison waived any privilege by disclosing the conversation to police. The trial court observed that "somebody needs to assert the privilege," and Allison returned to the courtroom and confirmed that she "wish[ed] to assert a marital privilege in testifying concerning communications between" her and her husband. Thereafter, the court ruled that it was "not going to allow that testimony."

### 2. *Discussion*

The confidential spousal communication privilege provides that "a spouse . . . whether or not a party, has a privilege during the marital . . . relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he or she claims the privilege and the communication was made in confidence between him or her and the other spouse while they were spouses." (Evid. Code, § 980.) This privilege "is waived . . . if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone." (Evid. Code, § 912, subd. (a).)

Shove contends that Allison waived the spousal communication privilege by disclosing the conversation to police and the court without asserting the privilege, and that her

92

belated assertion of the privilege at trial was too late. (See Evid. Code, § 912, subd. (a) ["Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has legal standing and the opportunity to claim the privilege"].) The Attorney General responds, however, that the privilege belonged to both Allison and Kenneth, and not Allison alone. (See Evid. Code, § 912, subd. (b) ["waiver of the right of one spouse to claim the privilege does not affect the right of the other spouse to claim the privilege"].) Thus, the Attorney General contends, the privilege was not waived because Kenneth was never provided the opportunity to assert or waive the privilege, and even if the trial court erred in its reason for upholding the privilege, its decision to do so was ultimately correct. Shove counters that because the trial court incorrectly ruled that Allison's assertion of the privilege precluded evidence of the statement, Shove was not given an opportunity to subpoena Kenneth to ascertain whether he would assert the privilege.

We need not resolve whether it was error to exclude Allison's statements on this record because any error was harmless in any event. Assuming the detectives would have testified that in 2004 Allison stated that her husband had told her he had recently met a man named "Monte" at an auction and found him strange, this proffered evidence had little probative value. Evidence indicating that Kenneth met Proulx at an auction could have impeached Kenneth's testimony that he never went to an auction with Proulx. But the force of such evidence would have been undercut by the fact that this purported meeting occurred approximately three years after the murders and between individuals affiliated with similar

businesses. Additionally, Allison would not have testified that her husband told her he had met Proulx. We conclude any constitutional error in excluding the evidence was harmless beyond a reasonable doubt; any violation of the Evidence Code was therefore likewise harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24; see also *People v. Contreras* (2013) 58 Cal.4th 123, 152 [courts have "wide latitude" to exclude impeachment on collateral matters]; *People v. Mendoza* (2016) 62 Cal.4th 856, 905 [there is no prejudice under the *Watson* standard for state law error if there is no prejudice under the more rigorous harmless error test for assessing federal constitutional error].)

## B. Asserted Prosecutorial Misconduct

### 1. *Asserted* Griffin *error*

Shove alleges that during guilt phase closing arguments, the prosecution improperly commented on Shove's failure to testify in violation of his Fifth Amendment right against self-incrimination. (*Griffin v. California* (1965) 380 U.S. 609, 615 (*Griffin*).) The claim is forfeited and lacks merit in any event.

### a. *Background*

During closing argument, the prosecutor argued that all of the "evidence points to" Shove. The prosecutor continued: "[W]hen his attorney gets up here . . . you ask and you should demand an answer to the questions why is the only connection between the killer and the victims your client? Why is Shove the only connection to the killer in this case? How can you explain that?" The prosecutor further continued: "Why is Theodore Shove the only person talking to Lewis Hardin that night on the phone, receiving and calling that night? Why? If it's . . . not him, then how can you explain that? Why is Theodore Shove's truck being used in all the[ ] surveillance of the family

of these victims?  Why is it his truck?  Why . . . is the extortion letter on his computer?  How can he explain why this very incriminating letter used in these extortions is on Theodore Shove's computer?  You are entitled answers to those questions and you should get them.  And you know what the answer to them all is, it's because they did it.  It's because they're guilty."

On rebuttal, the second prosecutor argued: "Now you will recall earlier today [the other prosecutor] very directly . . . challenge[d] the defense attorneys . . . to answer some very simple, basic questions.  And when the defense counsel, each of them, got up here and addressed you, they offered not one single answer. . . .  [T]hey were given an opportunity to come up with any answer that pointed to innocence.  This was their opportunity.  [Shove's counsel] talked for, I believe, two hours and 45 minutes.  [Hardin's counsel] talked for an hour and a half.  And they were given an opportunity to come up with an innocent explanation for these very basic points.  And they offered you none.  Why?  Because there is no innocent explanation for these very basic points.  The answers are, you are looking at two murderers.  That's the answer. . . .  We have given you answers for the last four weeks.  But they were given that opportunity; give us an innocent explanation, and they offered you not one.  [The other prosecutor] asked them, what's the connection between [the] victims and Hardin other than Shove?  Silence from the defense because there is no connection between the Southers and Hardin other than Shove.  They were asked, why were they calling each other all night that particular night?  Silence from the defense.  They were calling each other because they were planning, orchestrating and committing these horrendous crimes."

95

The prosecutor then recounted evidence concerning the sightings of Shove's truck and argued, "But what did we hear from the defense about those sightings of Shove's truck out there? Silence. Why is the extortion letter on Shove's computer? [Shove's counsel] must have talked about dogs barking for 45 minutes yesterday. . . . Not one answer, based on the evidence in this case, as to why that extortion letter is on Shove's computer. Because they have no innocent answer. All the answers point to their guilt."

### b. *Discussion*

Shove contends that the prosecutors' arguments constituted prosecutorial misconduct because they improperly commented on his failure to testify. (See *Griffin*, *supra*, 380 U.S. at p. 615.) The claim is forfeited because Shove's counsel did not object at trial to the comments he now challenges or request an admonition and no exception is applicable. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1333 (*Castaneda*); *Valdez*, *supra*, 32 Cal.4th at p. 127; *People v. Lewis* (2001) 25 Cal.4th 610, 670; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1050 (*Mitcham*).)

The claim is, in any event, meritless. "Under state law, ' "[a] prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct . . . ." ' [Citation.] Prosecutorial misconduct violates the federal Constitution when it results in a fundamentally unfair trial. [Citation.] When a claim of misconduct is based on remarks to the jury, we consider whether there is a reasonable likelihood the jury construed the remarks in an improper fashion." (*People v. Steskal* (2021) 11 Cal.5th 332, 350 (*Steskal*).) While *Griffin* prohibits a prosecutor from commenting directly or indirectly on a defendant's invocation of the right to silence, a prosecutor does not violate the *Griffin* rule by commenting on the state of the

96

evidence, including the absence of certain evidence and the failure of the defense to introduce material evidence or to call logical witnesses, unless "the only possible source of such evidence would have been the defendant." (*People v. Bloom* (2022) 12 Cal.5th 1008, 1055; see also, e.g., *Castaneda, supra,* 51 Cal.4th at p. 1333.)

Here, Shove challenges the prosecution's reference to "silence from the defense" on various evidentiary issues that pointed to Shove's and Hardin's guilt and argues that the words "silence" and "answer" could be interpreted as referring to Shove's decision not to testify. But the context of the prosecutor's statements makes clear that the prosecutor was referring to the anticipated closing argument from defense counsel, not the absence of Shove's trial testimony. Indeed, the prosecutor prefaced these arguments by telling the jury that "when [Shove's] attorney gets up here and he starts talking . . . you ask and you should demand an answer." On rebuttal, the prosecutor argued that "when the defense counsel, each of them, got up here and addressed you, they offered not one single answer." The prosecutor noted the duration of each defense counsel's closing argument and that "they were given an opportunity to come up with an innocent explanation for these very basic points." Each time the prosecutor said the word "silence," it was made clear that the prosecutor was referring to defense counsel, not to Shove himself.

Similarly, the prosecution's comment urging the jury to "demand an answer" or explanation from defense counsel as to why Shove was "the only connection between the killer and the victims . . . " was, on its face, directed at defense counsel; it, too, was merely argument "directed to the general failure of the defense to provide an innocent explanation." (*People v. Medina*

(1995) 11 Cal.4th 694, 756; see also *Mitcham*, *supra*, 1 Cal.4th at p. 1051 [*Griffin* "does not prohibit the prosecution from emphasizing . . . the absence of evidence controverting the prosecution's evidence"].) So too was questioning how Shove could explain the calls between him and Hardin the night of the murders or why his truck was used to surveil the victims' family. Asking these questions and telling the jury that they were entitled to answers "contained no references, express or implied, to defendant's own silence, and therefore were unobjectionable." (*Medina*, at p. 756; see also *Taylor*, *supra*, 48 Cal.4th at p. 633 [" 'Who took this stand and gave you a reasonable explanation' " as to defendant's presence in the victim's home was proper comment on the evidence and "not an implicit suggestion that defendant should have, or could have, provided a nonfelonious reason for his initial entry into the victim's home"].) "The prosecutor's remarks, viewed in context, can only be seen as a fair comment on the state of the evidence" (*Medina*, at p. 756), which is permitted "despite the mere possibility that the statement might also be interpreted as a reference to the defendant's failure to testify." (*Bryant*, *supra*, 60 Cal.4th at p. 387.)

Shove contends that only he could have provided the answers to the prosecution's questions. Not so. Someone other than Shove or Hardin could have provided testimony evidencing some innocent explanation for their communications on the night of the murders, the presence of Shove's truck at the Renck residence, the existence of the extortion letter on Shove's computer, or the fact that Shove was the only connection between Hardin and the Southers. In demanding an answer to these inculpatory circumstances, the prosecution "did not allude to the lack of refutation or denial by the sole remaining witness,

defendant, but rather to the lack of *evidence*, which might have been presented in the form of physical evidence or testimony other than that of defendant." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340; see also *People v. Gomez* (2018) 6 Cal.5th 243, 299 [defendant could have presented evidence other than defendant's testimony to rebut prosecutor's argument that there was no evidence defendant read newspaper articles about the offense].) There is, in sum, "no reasonable likelihood the comment[s] 'could have been understood, within its context, to refer to defendant's failure to testify.' " (*People v. Cleveland* (2004) 32 Cal.4th 704, 764.)

### 2. *Appeals to Sympathy of Jury*

Shove contends that the prosecution also committed prejudicial misconduct in the guilt phase closing argument by inviting the jurors to consider the crime through the eyes of the victims and the impact it had on their family members. We conclude that the claim is forfeited and any error would be harmless in any event.

### a. *Background*

The prosecutor began her closing argument by stating the following without objection:

"I want to talk for a moment about why we're here, who was killed, whose lives were taken. Mr. and Mrs. Souther. Mr. Souther, 81. Mrs. Souther, 79 years old. Married for over 50 years. Raised children, had grandchildren. You heard about Burt. You heard about his business. You heard about how much he loved Cal Aero, how much he invested in that business. You heard about how they really lived the American dream, how Burt worked hard to earn that business. How that was his — his baby. Little did they know that on that night,

September 15th, 2001, the nightmare they were about to encounter. Completely innocent and vulnerable victims. Elderly, weak, in poor health, laying in their beds in the dark. You don't get much more vulnerable than that. Little did they know that this man, Lewis Hardin, would be coming into their bedroom with a tire iron in his hand and he would just begin beating them without showing any mercy. Beating them. Think of that. Think of how they died. The last few minutes of their life struggling in that bed. Burt defending himself. Burt enduring broken bones. His teeth flying about the room. Their skulls being fractured. And then think about when they were first discovered. Think about Collette Kingsley that day when she gets that call and she's not at all imagining that this could be true, that anything like this could have happened. She's just going to check out and see what's wrong. Maybe her parents' phones aren't working. Maybe there's some misunderstanding, they forgot to tell her they were going somewhere. She goes to their house, she walks in, she sees, the broken door. She walks further, 'Mom.' 'Mom.' 'Dad.' 'Mom.' 'Dad.' Imagine that. She's walking down that hall, that long hallway to their bedroom and she finds her parents like this. This is how Lewis Hardin left the victims that night. This is what he did to them, and this is what he did to them because Theodore Shove wanted to profit. He wanted that business and he wanted money."

Near the end of its rebuttal, the prosecutor stated, over Shove's counsel's unsuccessful objection: "Six years ago, ladies and gentlemen, six years. Six years justice has been held in abeyance. Six years those who loved the Southers have waited. Waited. Waited for justice to be served in this case."

### b. Discussion

Shove's counsel objected only to the statements made on rebuttal and no exception to the requirement of an objection and admonition appears. Thus, as to the statements made at the beginning of the prosecutor's closing argument, the claim is forfeited. (See *People v. Caro* (2019) 7 Cal.5th 463, 510; see *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 919 (*Amezcua*); *People v. Seumanu* (2015) 61 Cal.4th 1293, 1320, 1340–1341 (*Seumanu*).) If the claim had not been forfeited, we would find error. The error is, however, harmless.

Prosecutors are given wide latitude to vigorously argue their case and " ' "to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." ' " (*Dworak, supra,* 11 Cal.5th at p. 910.) But " 'appeals to sympathy for the victim during an objective determination of guilt fall outside the bounds of vigorous argument.' " (*Steskal, supra,* 11 Cal.5th at p. 351, quoting *Amezcua, supra,* 6 Cal.5th at p. 920; see *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 (*Stansbury*), revd. on other grounds in *Stansbury v. California* (1994) 511 U.S. 318; *People v. Fields* (1983) 35 Cal.3d 329, 362–363.) Nor may a prosecutor invite the jury to consider the impact of the crime on the victim's family during the guilt phase of a capital trial. (See, e.g., *People v. Jackson* (2009) 45 Cal.4th 662, 691–692; *People v. Salcido* (2008) 44 Cal.4th 93, 150–151 (*Salcido*).)

We conclude that some of the prosecutor's closing argument crossed the line demarking vigorous argument and "improperly appealed to the passions of the jury in urging them to consider the suffering of the victim[s] . . . ." (*Stansbury, supra,* 4 Cal.4th at p. 1057.) Of course, "the prosecutor is not required to shield the jury from all favorable inferences about

the victim's life or to describe relevant events in artificially drab or clinical terms." (*People v. Millwee* (1998) 18 Cal.4th 96, 138.) Thus, recounting the victims' injuries was fair commentary on the evidence. (See *People v. Martinez* (2010) 47 Cal.4th 911, 957 (*Martinez*) [description of victim " 'suffering' a 'savage beating' " and "how it reflected defendant's 'violent capabilities' were fair comments on the evidence"].)

But the prosecutor veered into improper argument by coupling a description of the Southers' injuries with an urging that the jury "[t]hink of how they died" and how, after pursuing a full and successful life of family and work, they spent "[t]he last few minutes of their life struggling in that bed." To be sure, the details of the offense were based upon the trial evidence, and the prosecutor did not expressly invite the jury to imagine what the victims might have been thinking or to view the crime through their eyes. (See *Stansbury*, *supra*, 4 Cal.4th at p. 1057; *Amezcua*, *supra*, 6 Cal.5th at p. 919; *Seumanu*, *supra*, 61 Cal.4th at pp. 1343–1344; *People v. Leonard* (2007) 40 Cal.4th 1370, 1407.) Explicitly asking a jury to imagine themselves in the victim's place is not, however, the only way for a prosecutor to improperly appeal for sympathy. (See, e.g., *People v. Kipp* (2001) 26 Cal.4th 1100, 1129–1130 (*Kipp*) [inviting the jury to "reflect on all that the victim had lost through her death" by thinking about "[a] living, breathing human being ha[ving] all of that taken away" was an improper appeal for sympathy].) In *People v. Sanchez* (2019) 7 Cal.5th 14, 66, for instance, the prosecutor commented that a victim " 'died not knowing if her youngest [child] was going to make it, but knowing her oldest hadn't.' " We held that although "the prosecutor only indirectly suggested that the jury should view the crime through [the victim's] eyes . . . the comment was

irrelevant to defendant's guilt and, for that reason, should not have been made." (*Ibid*.) The same is true here.

It was also improper for the prosecutor to recount Collette discovering her parents' bodies and then ask jurors to "imagine" this experience. The Attorney General contends that this argument was akin to that in *People v. Pearson* (2013) 56 Cal.4th 393, 441, where we held that characterizing shooting survivors as victims and recounting their testimony was not an improper appeal to the jury's sympathy, as "[t]he prosecutor was reminding the jury of the unique accounts of the shooting spree offered by those who survived." But Collette did not witness the murders, and asking the jury to suppose what she was thinking when she went to the house and to "[i]magine" her calling out for her parents before discovering their bodies was irrelevant and an improper appeal to the jurors' sympathies.

The only statement as to which Shove preserved an objection concerned the amount of time that had elapsed before trial: that the Southers' loved ones had waited six years "for justice to be served in this case." Contrary to Shove's suggestion, the comment did not suggest that Shove was to blame for the lapse of time, nor did the argument "relate the effect of defendant's acts upon family members." (*Salcido*, *supra*, 44 Cal.4th at p. 151.) But we would conclude that the comment was improper insofar as it appealed to sympathy for the victims' family in the context of the jury's guilt determination.

Regardless, any misconduct here did not prejudice Shove. The appeals to the jurors' sympathies were neither direct nor explicit in content; the improper arguments were relatively brief in the context of the entirety of the prosecution's closing; and the prosecutor made no further appeals to sympathy. (See *Kipp*,

*supra*, 26 Cal.4th at p. 1130.)  Furthermore, the court instructed the jury that it "must not be influenced by pity for or prejudice against a defendant," or "by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.  Both the People and a defendant have a right to expect that you will . . . reach a just verdict regardless of the consequences."  We presume the jury followed that instruction. (See *Steskal*, *supra*, 11 Cal.5th  at  p. 351;  *Daveggio*,  *supra*,  4 Cal.5th  at  p. 857; *Martinez*, *supra*, 47 Cal.4th at p. 957.)

Shove contends that even if any individual instance of prosecutorial misconduct was harmless, "[a]ll of the misconduct in this case . . . acted synergistically to produce [Shove's] conviction."  (See *Seumanu, supra*, 61 Cal.4th at p. 1350 ["a number of instances of prosecutorial misconduct may act synergistically to create an atmosphere of prejudice more intense than the sum of its parts"].)  But Shove has failed to establish any such pattern of misconduct.  Shove mentions certain prosecutorial actions, such as pointing out the evidence suggested that Shove was the only connection between Hardin, Vann, and the victims, without actually raising a cognizable misconduct claim.  (See *ante*, fn. 10.)  The argument does not persuade us that prejudicial error occurred.

## IV.    PENALTY PHASE

### A.  Exclusion of Lingering Doubt Evidence

Shove contends that he was precluded from presenting penalty phase evidence that would have created a lingering doubt as to his guilt, namely, evidence that a detective opined in a search warrant affidavit that Kenneth, Allison, Reiland, Proulx, and Vann may have been involved in the murders.

The trial court did not err in excluding this evidence. The detective's opinion that others may have been involved in the offenses was not admissible for purposes of creating a lingering doubt as to Shove's guilt. (See *People v. Duong* (2020) 10 Cal.5th 36, 60 [" 'opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact . . . the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt' "].) Although "a defendant may argue lingering doubt at the penalty phase of a capital trial as a mitigating consideration" (*People v. Jones* (2003) 30 Cal.4th 1084, 1125), a defendant may not "introduce evidence, not otherwise admissible at the penalty phase, for the purpose of creating a doubt as to the defendant's guilt." (*People v. Zapien* (1993) 4 Cal.4th 929, 989; see also *People v. Lucas* (2014) 60 Cal.4th 153, 308 ["The right to present mitigating evidence in the penalty phase 'does not trump or override the ordinary rules of evidence' "].) Shove also contends that the trial court precluded him from presenting the evidence underlying the detective's opinion, but the record does not bear out the contention. Although Shove's counsel requested to introduce the facts supporting the opinion, he chiefly sought the admission of the opinion itself. The trial court stated it was willing to consider other admissible evidence concerning the circumstances of the offenses but that opinions were inadmissible, and Shove's counsel proffered no other admissible evidence underlying the opinion. Shove identifies no abuse of discretion in the court's rulings.

In any event, there is no reasonable possibility that the exclusion of the detective's opinion or any of the third party culpability evidence excluded at the guilt phase affected the penalty determination. (See *People v. Mataele* (2022) 13 Cal.5th

372, 428; *Holmes, McClain, supra*, 12 Cal.5th at p. 815.)  At the penalty phase, the jury was instructed that it could consider any lingering doubt it had as to Shove's guilt as a mitigating factor. As we have explained above in addressing Shove's claims at the guilt phase, much of the third party culpability evidence in question was already placed before the jury, and evidence of others' involvement in the murders would not tend to exculpate Shove in any event.    Furthermore, there was significant aggravating evidence presented at the penalty phase beyond the circumstances of the crime, including Shove's violent acts committed against his ex-wives, sister, and a motorist, and his commission of a robbery with a firearm.  The penalty phase defense case was comparatively weak, consisting only of good character evidence presented through Shove's wife and her son, both of whom Shove had met after the Southers' murders. Accordingly, the exclusion of any third party culpability evidence did not prejudice Shove at the penalty phase.

## B.  Notice of Victim Impact Testimony

Shove asserts that the prosecution failed to timely inform the defense that the Southers' granddaughter, S.A., had attempted suicide near the anniversary of her grandparents' deaths.  Shove claims the trial court erroneously admitted this evidence over his objection and denied his request for a continuance in violation of his statutory discovery right and constitutional right to due process, the effective assistance of counsel, and a reliable death judgment.  We conclude that, assuming the prosecution failed to timely satisfy any disclosure obligations, Shove fails to demonstrate prejudice.

### 1. *Background*

Before trial, the prosecution notified court and counsel that its penalty phase aggravating evidence would include "the testimony of the Souther's [sic] family and the testimony of other close family members and friends regarding the emotional and psychological impact of each victim's death upon their lives." In response to Shove's request for penalty phase discovery and an offer of proof, the prosecution claimed that it "h[ad] gone above and beyond what the courts have considered to be adequate notice," under Penal Code section 190.3, asserting that "[t]he defendants have been provided with not only reports, witness' statements and the details of what potential penalty phase witnesses will testify to, but have moreover been provided with an updated statement in aggravation." The record is, however, unclear as to what reports were provided to the defense or the contents thereof.

In her penalty phase opening statement, the prosecutor stated that S.A. would testify that she was very close with her grandparents and that after their deaths, "she couldn't function" in school, failed her first year of college, and attempted suicide near the anniversary of their deaths because she "wanted to be with them." At sidebar, Shove's counsel objected that he had not received discovery concerning S.A.'s suicide attempt. The prosecutor countered: "We gave notice of victim impact. That's all that's required. Not every single thing they are going to say." Shove's counsel argued that prior to trial, the court had ordered the parties to provide each other with written witness

statements,[19] and that the late disclosure left the defense no time to investigate.

When asked if there was an interview of S.A., one prosecutor asserted: "No. Actually I just spoke with her and she told me. Not just spoke, but I was informed by speaking with her." When asked when, the prosecutor responded: "I didn't — there is no report; there is no formal interview. It is just her mom had told me, and then we flew her in." The court was "bother[ed]" by the nondisclosure and observed that the suicide attempt was a "very specific claim." The other prosecutor stated: "[S.A.] just flew out yesterday, your honor, when I believe [the other prosecutor] interviewed her. So maybe they should have been informed of that yesterday." Shove's counsel argued that he would have investigated the evidence but that the defense was now "sandbagged" and requested that S.A. be precluded from testifying. The court requested authority, deferred ruling, and stated that S.A. should be made available for interview during the lunch hour.

When the court reconvened, Hardin's counsel stated that he had interviewed S.A., who related that a deputy "interviewed her, I think she said about a month ago when she gave that information. And it may have been that the prosecutors had it as early as last Tuesday or Wednesday. So it is a week." Hardin's counsel objected to S.A.'s testimony pending receipt of

---

**19** During a pretrial discussion concerning potential defense witness statements, the court stated: "And remember . . . we're not going to play this game where we talk to a witness and we didn't write anything down or we didn't tape record it. We're not going to play that game. If you talk to a witness or your investigator talks to a witness, then somehow or another that statement has to be memorialized so it can be turned over to the prosecution."

records from the hospital where S.A. had been treated. Shove's counsel joined in the objection. The prosecutor countered that Penal Code section 190.3 did not require the prosecutor to provide a summation of the witnesses' expected testimony. After reviewing the cases the prosecution had cited, the court agreed that the prosecution's earlier disclosure had been adequate and overruled the defense's objection to S.A.'s testimony.

S.A. later testified: "Right around a year of their anniversary, I was just really upset about everything that was happening. I wasn't in the right state of mind, and I just wanted to be with them. So I took a ton of aspirin, a big bottle of aspirin, and just tried to fall asleep, hoping I would never wake up. . . . And it was so horrible, and I just wanted to be with my grandma again."

### 2. *Discussion*

Shove contends the prosecution failed to give adequate notice and discovery of victim impact testimony. The Attorney General asserts that the prosecution met its obligations under Penal Code section 190.3,[20] as the statute does not require the prosecution to provide the defense with a summation of aggravation witnesses' expected testimony. (See *People v. Benavides* (2005) 35 Cal.4th 69, 107; *People v. Seaton* (2001) 26 Cal.4th 598, 676 ["Section 190.3 requires the prosecution only to give the defense *notice* of the evidence it intends to introduce, not to *produce* it"].) Shove argues that, regardless of

---

[20] Penal Code section 190.3 provides, in pertinent part, "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial."

Penal Code section 190.3, the reciprocal discovery provisions of Penal Code section 1054 et seq. required the prosecution to disclose S.A.'s statements. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 955 (*Gonzalez*) [Pen. Code, § 190.3 "does not itself provide for, or preclude, discovery. The discovery provisions [of Penal Code section 1054 et seq.] coexist with this notice provision" and "[w]e must give effect to both"].) The Attorney General counters that we have never held that Penal Code section 1054.1, subdivision (f), which requires the prosecution to disclose reports of witness statements, applies at the penalty phase, or to oral statements of witnesses (see *People v. Thompson* (2016) 1 Cal.5th 1043, 1102–1104 (*Thompson*)), and that so holding would contravene our prior interpretations of Penal Code section 190.3. (See, e.g., *People v. Scott* (1997) 15 Cal.4th 1188, 1219 [defense not entitled to summation of witnesses' expected penalty phase testimony]; *People v. Roberts* (1992) 2 Cal.4th 271, 330 [same].)

We need not resolve whether S.A.'s statements should have been disclosed to the defense before trial; even if there was error, it was harmless beyond a reasonable doubt. "The test for state law error at the penalty phase of a capital trial is whether there is a reasonable *possibility* the error affected the verdict," which is the " 'same in substance and effect' " as *Chapman*'s beyond-a-reasonable-doubt standard.[21] (*Gonzalez*, *supra*,

---

[21] Accordingly, we need not resolve Shove's claim that the nondisclosure violated his federal constitutional due process rights, as any assumed violation would be evaluated for prejudice under the same standard. (See *Gonzalez*, *supra*, 38 Cal.4th at p. 961 ["To the extent the denial of discovery implicated defendant's federal due process rights [citation], the

38 Cal.4th at pp. 960–961.) Here, there is no reasonable possibility that the belated disclosure affected the penalty phase verdict.[22] Although Shove complains that the lack of notice interfered with his ability to mitigate the evidence, Shove does not "explain how he could have rebutted or impeached [S.A.] at the penalty phase had he received notice earlier." (*People v. Hinton* (2006) 37 Cal.4th 839, 900; see also *Thompson, supra*, 1 Cal.5th at p. 1104 ["defendant does not explain how earlier disclosure of [witness's] oral statements would have made any difference to her defense strategy"].) While Shove's counsel argued below that he would have investigated S.A.'s testimony and subpoenaed her hospital records, but was denied the opportunity to do so, it is difficult to imagine how the medical records would be especially probative, and it is not unreasonable to expect some more detailed proffer when such records are sought. In sum, Shove makes no persuasive argument that he would have done anything differently at trial had he had information of the suicide attempt a week or a month earlier.

Additionally, though the court denied Shove's counsel's request for a continuance, he was afforded an opportunity to interview S.A. prior to her testimony. He then declined to cross-examine S.A. Finally, evidence of S.A.'s suicide attempt was of

applicable test is whether the error is harmless beyond a reasonable doubt. [Citation.] . . . Accordingly, we focus on the 'reasonable possibility' test, but our conclusion applies equally to *Chapman*'s 'reasonable doubt' test"].)

[22] Shove does not allege that Abbott's testimony was inadmissible. Indeed, as Shove acknowledges, we have held that victim impact evidence concerning suicide attempts can properly demonstrate how a victim's death affected their surviving family members. (See *People v. Booker* (2011) 51 Cal.4th 141, 193; *People v. Wilson* (2005) 36 Cal.4th 309, 357.)

less weight than the circumstances of the crime and other aggravating evidence of violent and threatening conduct. On this record, there is no reasonable possibility any untimely disclosure affected the penalty verdict.

## C. Admission of Victim Impact Testimony

Shove argues that the trial court erroneously admitted victim impact evidence outside the scope of *Payne v. Tennessee* (1991) 501 U.S. 808, 827 (*Payne*). We see no error.

At the penalty phase, Collette testified to the emotional impact of discovering her parents murdered and described their good qualities and how she missed them. S.A. testified that she was close to her grandparents and about how deeply their deaths had affected her. Shove's counsel then unsuccessfully objected to further victim impact testimony as cumulative under Evidence Code section 352.

Allison subsequently testified recounting memories of being raised by her parents, during which Shove's counsel unsuccessfully objected that victim impact evidence does not "allow the jury to get a full historical review of the victims." Allison then testified regarding her relationship with her parents, their relationship with her children, and how learning about her parents' murders affected her and her children. Elizabeth's brother-in-law testified about how he had met the Southers, their personalities, and how their deaths affected his wife and children. After Shove's counsel objected and moved to strike this testimony as unrelated to the impact the Southers' deaths had on him, personally, the brother-in-law testified on redirect that the murders "destroyed" his life. Elizabeth's sister also testified about growing up with her sister and how the murders affected her. Shove's counsel later objected on relevance and Evidence Code section 352 grounds to

photographs of the Southers and their relatives introduced during this testimony; the trial court overruled the objection, finding it "illustrative" of how the surviving witnesses "have been impacted and what the victims meant to them . . . ."

In *Payne*, the United States Supreme Court held that the Eighth Amendment "erects no *per se* bar" on victim impact evidence. (*Payne*, *supra*, 501 U.S. at p. 827.) Following *Payne*, we held "that the injury inflicted is generally a circumstance of the crime as that phrase is commonly understood"; thus, "factor (a) of [Penal Code] section 190.3 allows evidence and argument on the specific harm caused by the defendant, including the impact on the family of the victim." (*People v. Edwards* (1991) 54 Cal.3d 787, 835.)

Acknowledging that we have rejected similar challenges to admitting victim impact evidence as a circumstance of the crime under Penal Code section 190.3, factor (a) (see *Brown*, *supra*, 31 Cal.4th at pp. 573–574; *People v. Boyette* (2002) 29 Cal.4th 381, 446, fn. 12), Shove nevertheless asserts, "to preserve for federal review," a claim that this factor is vague and overbroad "at least to the extent that it permits victim impact evidence describing the impact beyond those family members who were personally present at the scene of the capital murder during or immediately after the murder." Shove asserts no persuasive reason to revisit our conclusion. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1025.)

Shove's argument that *Bosse v. Oklahoma* (2016) 580 U.S. 1 undermines our precedent is without merit. There, the high court ruled that *Payne* did not overturn the prohibition in *Booth v. Maryland* (1987) 482 U.S. 496 on characterizations and opinions from a victim's family members about the crime, the defendant, and the appropriate sentence. (*Bosse*, at p. 3.) No

such testimony was given here, and the range of evidence *Payne* permits is not as narrow as Shove suggests, so *Bosse* does not help the argument. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 509 [the *Payne* court "stated its holding in broad terms" and "does not support the narrow limitations urged by defendant"]; see also *People v. Johnsen* (2021) 10 Cal.5th 1116, 1173 ["factor (a) is not so narrow" as to limit victim impact evidence to a deceased victim]; *Steskal, supra,* 11 Cal.5th at p. 370 [victim impact evidence is not limited to family members].) Nor do Shove's "citations to out-of-state authorities interpreting out-of-state statutes [citations]. . . persuade us to reconsider our precedent regarding the proper limits of victim impact statement under *Payne* and [Penal Code] section 190.3, factor (a)." (*People v. Ramirez, supra,* 10 Cal.5th at p. 1026; see also *Hartsch,* at p. 509.)

### D. Constitutionality of California's Death Penalty Statute and Instructions

Shove asserts that "[m]any features California's capital sentencing scheme violate the United States Constitution," though he acknowledges that we have "consistently rejected cogently phrased arguments pointing out these deficiencies." Accordingly, he presents, and we again reject,[23] the following "routine" challenges to California's death penalty statute, and decline his invitation to reconsider our prior precedent on these claims. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303–304.)

"Penal Code section 190.2 is not impermissibly broad and adequately narrows the class of murders for which the death penalty may be imposed. [Citation.] Penal Code section 190.3,

---

[23] We assume, for purposes of this decision, that Shove has not forfeited any of these contentions.

factor (a), which permits the jury to consider the circumstances of the crime in sentencing 'does not result in arbitrary or capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution.' " (*People v. Wilson* (2024) 16 Cal.5th 874, 942 (*Wilson*).)

"Because the jury's penalty choice is a normative decision, not a factual one [citation], California's death penalty scheme does not violate the federal Constitution for failing to require written findings [citation] or unanimous findings as to the existence of aggravating factors, prior convictions, or unadjudicated criminal activity [citations].  Nor is the scheme deficient because it does not require findings be made beyond a reasonable doubt as to the existence of aggravating factors (other than [Pen. Code,] § 190.3 factor (b) or (c) evidence), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty."  (*Nadey*, *supra*, 16 Cal.5th at p. 191.)  The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, *Blakely v. Washington* (2004) 542 U.S. 296, and *Hurst v. Florida* (2016) 577 U.S. 92 do not alter these conclusions.  (*Nadey*, at p. 191; *Wilson*, *supra*, 16 Cal.5th at pp. 942–943; *People v. Frazier* (2024) 16 Cal.5th 814, 864 (*Frazier*).)  "Nor does the federal Constitution require the trial court to instruct the jury 'that the prosecution has the burden of persuasion regarding the existence of aggravating factors, the weight of aggravating versus mitigating factors, and the appropriateness of a death judgment.  [Citations.]  In addition, the trial court need not instruct the jury that life without parole was presumed the appropriate sentence.' " (*Wilson*, at p. 943.)

"Instructing the jury that a death verdict is 'warranted' if the aggravating factors are ' "so substantial" ' in comparison with the mitigating factors is not impermissibly broad or vague. [Citation.] [¶] The trial court does not need to instruct the jury that it must impose life without the possibility of parole if it determines that mitigating factors outweigh aggravating factors. [Citation.] [¶] The trial court did 'not impermissibly fail to inform the jurors regarding the . . . lack of need for unanimity as to mitigating circumstances.' " (*Frazier*, *supra*, 16 Cal.5th at p. 864.) Nor does the federal Constitution require that jurors be instructed that there was no burden of proof as to mitigating factors. (*People v. Johnson* (2018) 6 Cal.5th 541, 593–594.) There is also " ' " 'no requirement jurors be instructed there is a " ' "presumption of life . . . ." ' " ' " ' " (*Frazier*, at p. 864.)

" 'Use of adjectives such as "extreme" and "substantial" in [Penal Code] section 190.3, factors (d) and (g), respectively, does not create a constitutionally impermissible barrier to the jury's consideration of a defendant's mitigating evidence,' " " '[t]here was no requirement that inapplicable sentencing factors be deleted,' " and "[t]he trial court was not required to 'define which of the statutory factors could be aggravating and which were only mitigating.' " (*Frazier*, *supra*, 16 Cal.5th at pp. 864–865.)

Finally, " '[c]omparative intercase proportionality review by the trial or appellate courts is not constitutionally required,' " " '[t]he death penalty scheme does not violate equal protection principles "by providing significantly fewer procedural protections for persons facing a death sentence than are afforded persons charged with noncapital crimes," ' " and " '[t]he imposition of the death penalty under California's law does not

violate international law or prevailing norms of decency.' " (*Frazier, supra*, 16 Cal.5th at p. 865.)

## V.    CUMULATIVE ERROR

Shove argues that even if we conclude no individual error prejudicial, the cumulative effect of guilt and penalty phase errors warrants reversal of the judgment.  We have concluded there was error, or assumed error but concluded there was no prejudice, in the admission of the audio recording (*ante*, pt. II.C.), the denial of Shove's counsel's request to impeach Kenneth with inconsistent statements (*ante*, pt. III.A.), the prosecution's appeals to sympathy (*ante*, pt. III.B.2.), and the failure to provide specific timely disclosure of S.A.'s attempted suicide (*ante*, pt. IV.B.).  Even considered in combination, these errors do not " 'rise by accretion to the level of reversible and prejudicial error.' " (*People v. Lamb* (2024) 16 Cal.5th 400, 455.)

## VI.    DISPOSITION

The judgment is affirmed.

**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**GROBAN, J.**
**EARL, J.**[*]

---

[*]    Administrative Presiding Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. SHOVE

S161909


Dissenting Opinion by Justice Evans


Under *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258, a defendant has the right to challenge a prosecutor's peremptory challenges as impermissibly based on discriminatory bias. The *Batson/Wheeler* inquiry consists of three steps. First, the opponent of the strike must make out a prima face case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination. (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*).) Questions have frequently arisen as to which "procedure applies when the trial court, having determined that no prima facie case was established and having heard the proffered justifications, goes ahead and makes an alternative holding that those reasons were genuine." (*Id.* at p. 386.) In *Scott*, recognizing that "our jurisprudence on this issue has not always been entirely consistent" we clarified the rules governing this process. (*Ibid.*)

Emphasizing that our rule should "be clear, predictable, and easy to apply" (*Scott, supra,* 61 Cal.4th at p. 389), we

formulated a straightforward holding coupled with an important exception. Where "(1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling." (*Id.* at p. 391.) If the appellate court "agrees with the trial court's first-stage ruling, the claim is resolved. If the appellate court disagrees, it can proceed directly to review of the third-stage ruling, aided by a full record of reasons and the trial court's evaluation of their plausibility." (*Ibid.*)

However, we underscored that the prosecutor's justifications, a component of the second and third steps, can play no role, either at the trial level or on appeal, in negating a prima facie case at the first step. (*Scott, supra*, 61 Cal.4th at p. 390.) Thus, we excepted from the above procedure situations in which the trial court "purported to rule on the first stage only after the prosecutor had already offered a statement of reasons." (*Id.* at p. 387, fn. 1.) Where a trial court "solicits an explanation of the strike without first declaring its views on the first stage, we infer an 'implied prima facie finding' of discrimination and proceed directly to review of the ultimate question of purposeful discrimination." (*Ibid.*) As the majority correctly holds, *Scott*'s footnote 1 exception applies here. (Maj. opn., *ante*, at pp. 56–59.)

However, the majority makes two missteps. First, it credits the trial court with making a complete third-stage finding by remarking that the justifications were "race-neutral."

However, the record does not substantiate that such a finding, which requires a determination "that the prosecutor's nondiscriminatory reasons are genuine," ever occurred. (*Scott, supra,* 61 Cal.4th at p. 391.) The majority's contrary analysis contravenes the United States Supreme Court's recent decision in *Pitchford v. Cain* (2026) ___ U.S. ___ [146 S.Ct. 1345] (*Pitchford*), issued after briefing and argument in this case. Second, the majority adds an additional and unnecessary exception to the *Scott* footnote 1 exception, to address the prosecutor's failure to provide any justification for one of the jurors at issue here. As to the juror for whom no justification was provided, the majority decides to review the *Batson/Wheeler* challenge at stage one, despite reviewing all the other jurors at stage three. This piecemeal review makes no sense in light of the trial court's singular and global finding of no prima facie case. For these reasons, I respectfully dissent and would reverse the judgment.

## I.   PROCEDURAL BACKGROUND

As recounted by the majority, after Shove's *Batson/Wheeler* objection, the prosecutor provided justifications for her challenges of four Black prospective jurors: Prospective Jurors Nos. 218, 202, 215, and 7. (Maj. opn., *ante,* at pp. 54–55.) However, in what the majority describes as a "wrinkle," the prosecutor did not proffer a reason for the first juror excused, Prospective Juror No. 206. (Maj. opn., *ante,* at p. 58.) Immediately after the prosecutor had provided her reasons, and without giving the defendant an opportunity to respond, the trial court concluded: "I am going to find — I didn't find a prima facie case, and I am not finding a prima facie case. However, I did allow the prosecution to state the reasons for the exercise of the challenges. And I do believe that the reasons that have been

3

indicated for the African/American jurors that have been excused are race-neutral reasons, and I am denying the *Wheeler* motion at this time."

## II.   PROSPECTIVE JURORS NOS. 218, 202, 215, 7

Because the prosecutor gave reasons prior to the trial court's finding of no prima facie case, the parties dispute whether this is a first or a third stage *Batson*/*Wheeler* claim. Citing *Scott*, the majority correctly explains our rule for "hybrid" *Batson /Wheeler* claims in the scenario described above:  where the " 'trial court solicits an explanation of the strike without first declaring its views on the first stage, we infer an "implied prima facie finding" of discrimination and proceed directly to review of the ultimate question of purposeful discrimination.' "  (Maj. opn., *ante*, at p. 56, citing *Scott*, *supra,* 61 Cal.4th at p. 387, fn. 1.)  The Attorney General argues, and the majority accepts, that the court did not explicitly "solicit" the prosecutor's justifications here.  But *Scott* was not only concerned with reasons that were affirmatively *solicited*.  (*Scott*, at p. 387, fn. 1 [exception applies whenever prosecutor "offered a statement of reasons" prior to the trial court's prima facie finding].)  As our subsequent cases have reaffirmed, under *Scott*, "when a trial court merely '*listens* to the prosecutor's reasons before purporting to rule on the first-stage inquiry' " reviewing courts should proceed to the third step of *Batson*/*Wheeler*.  (Maj. opn., *ante*, at p. 57, quoting *People v. Krebs* (2019) 8 Cal.5th 265, 290 (*Krebs*) & citing *People v. Hardy* (2018) 5 Cal.5th 56, 75–76.) This rule makes sense because the trial court's determination at the first stage should be independent of any reasons that the prosecution gives for the challenge. Where the trial court has heard the prosecutor's reasons for the challenge, a reviewing court cannot ascertain whether the prima facie finding was

impermissibly influenced by the prosecution's challenges. Thus, our precedent instructs appellate courts to infer a prima facie case even if the trial court, after hearing the reasons, says it found no prima facie case.[1]  The calendar therefore properly

---

[1]  In concluding, as *Scott* holds, that the only feasible solution is to infer a prima facie case, I note that there exists significant independent support for a prima facie finding of discrimination here.  As the majority notes, the "prosecution did exercise five of its first eight challenges against Black prospective jurors" (maj. opn., *ante*, at p. 61), and thus the raw strike rate (62.5 percent) is quite high.  (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 761 [strike rate of 50 percent "important" and reflected "obvious disparity"]; *People v. Sánchez* (2016) 63 Cal.4th 411, 439 [strike rate of 40 percent, "[c]onsidered alone . . . might suggest a discriminatory purpose"].)  Moreover, the victims in this case were White, and the codefendant and actual killer, for whom the same jury was being selected, was Black.  (Maj. opn., *ante*, at p. 60.)  In finding no prima facie case, the majority relies heavily on the extremely diverse composition of the ultimate jury, and the prosecutor's acceptance of prior panels including Black jurors as evidence of the prosecutor's "good faith."  (*Id.* at pp. 61–62.)  Notably, however, this postruling information was not before the trial court at the time it made the ruling now under review.  (See *People v. Reed* (2018) 4 Cal.5th 989, 999, 1022 (dis. opn. of Liu, J.) [expressing skepticism regarding consideration of such after-the-fact evidence and concluding that "[p]ostruling developments, such as the final percentage of strikes used on black jurors, are better understood as going to the ultimate issue of whether the prosecutor acted with discriminatory intent, not to the preliminary issue of whether the prosecutor should have been required to state reasons for a strike at the time the challenge was made"]; *id.* at p. 1031 (dis. opn. of Kruger, J.) [dissenting "for the reasons expressed in Justice Liu's dissenting opinion"].)

The majority here does not address *Scott*'s concern that the prosecutor's provision of justifications prior to the trial

proposes that, for "challenged jurors for whom the prosecutor proffered justifications, we proceed directly to the third stage of the analysis" (maj. opn., *ante*, at p. 58) which it finds does not demonstrate discrimination.  (Maj. opn., *ante*, at pp. 72–90.)

The problem with the majority's decision to conduct such a third stage analysis is that the trial court did not complete a third stage finding here.  As Justice Liu recently explained, in a dissenting opinion in which I joined, the trial court's mere identification of the prosecutor's reasons as "race neutral" does not complete the third step of *Batson*/*Wheeler* analysis.  (*People v. Aguirre* (2025) 18 Cal.5th 629, 719–725 (dis. opn. of Liu, J.) (*Aguirre*); *id.* at p. 720 [trial court's statement that the reasons " '[t]hey appear to be race neutral,' " did not adequately express a third stage finding]; see also *id.* at pp. 736–737, fns. 5 & 6 (dis. opn. of Evans, J.) [collecting state and federal cases holding that an identification of a justification as "race-neutral" is insufficient to complete *Batson* stage three].)

The *Aguirre* majority disagreed but anchored its holding to the particular facts of that case.  (See *Aguirre, supra*, 18 Cal.5th at pp. 664–665 & fn. 15 ["viewed in context" the trial

---

court's ruling could have influenced its decision-making. Perhaps if this were a case in which no reasonable judge would have found a prima facie case, this procedural problem could be overlooked.  But here a contrary finding — that a prima facie case *had* been established — would be entirely consistent with the existing record.  In other words, this is exactly the type of case that demonstrates the importance of the rule announced in *Scott*:  a case in which the trial court may have overlooked a high strike rate and other evidence raising an inference of discrimination because it agreed with the reasons the prosecutor provided and improperly conflated *Batson/Wheeler*'s first and third steps in assessing the prima facie case.

court's language reflected a third stage finding and noting that "whether the court is applying the correct standard in making a ruling may be unclear in other trial court proceedings."].)  Here, unlike in the analysis adopted in *Aguirre*, there are no signs that the trial court was "actively mapping the reasons given by the prosecutor against what it recalled as the prospective juror's responses to questions, instead of accepting the prosecutor's reasons without any critical evaluation." (*Id.* at p. 665.)  To the contrary, here, the trial court said nothing indicating any type of analysis of the prosecutor's reasons.  Indeed, the trial court did not notice that the prosecutor failed to give any reason at all for one of the jurors at issue.  Reading the record, it appears that the trial court seems to have just been " 'allow[ing] the prosecution to state the reasons' " (maj. opn., *ante*, at p. 55), but did not independently evaluate them.

As the majority here accepts, the "trial court's comments about the race neutrality of the prosecutor's reasons did not *explicitly* address the prosecutor's credibility." (Maj. opn., *ante*, at p. 69, italics added.)  But nothing in the record even *implicitly* suggests that the trial court actively attempted to assess the prosecutor's credibility or otherwise engaged in an assessment of the prosecutor's subjective genuineness. (Cf. *Aguirre*, *supra*, 18 Cal.5th at pp. 664–665; see also *Dolphy v. Mantello* (2d Cir. 2009) 552 F.3d 236, 239 [ruling by trial court " 'I'm satisfied that is a race neutral explanation, so the strike stands' " was "such a conclusory statement [that it] does not necessarily indicate — even by inference — that the trial court credited the prosecution's explanation"].)  Indeed, the Attorney General concedes that the trial court intended only a stage one finding, stating in his briefing that "[t]he context of the discussion shows that the court and all counsel believed this to be a stage one

7

analysis" and that "the record shows the trial court did not intend to proceed past the first stage."

Aside from referring to the trial court's observation that the prosecutor's reasons were "race-neutral," the only context the majority provides is that defense counsel "did not dispute the factual bases or sincerity of any of the prosecutor's reasons." (Maj. opn., *ante*, at pp. 69–70.) But this turns the record on its head. The reason that defense counsel did not dispute the credibility of the prosecutor's justifications is that the trial court did not give the defense an opportunity to do so. The trial court here immediately responded to the prosecutor's justifications by asserting that there was no prima facie case and cut off all further discussion by stating "and . . . the reasons . . . are race-neutral reasons, and I am denying the *Wheeler* motion at this time." The record reflects the sidebar on the *Batson/Wheeler* motion then ended and the trial court stated: "All right, the peremptory is with the defense." The court's failure to give an opportunity for defense input prior to denying the motion is further indication that the trial court was not engaging in a full third-stage analysis. Thus, the question is not whether we should defer to a trial court's stage three finding (maj. opn., *ante*, at p. 70), but whether the trial court completed the third stage at all.

The United States Supreme Court's decision in *Pitchford, supra,* ___ U.S. ____ [146 S.Ct. 1345], issued after briefing and argument in this case, dictates the answer. In *Pitchford*, after a defense challenge, the prosecutor offered reasons for striking each of the jurors, and "the trial court declared each to be race neutral." (*Id.* at p. ___ [146 S.Ct. at p. 1350].) "Upon hearing the prosecutor's reason for the last strike, the trial court stated that '[t]he Court finds that to be race neutral as well,' and

pivoted immediately to the defense's peremptory strikes." (*Ibid*.) At that time, as in this case, "the trial court did not afford defense counsel an opportunity to rebut as pretextual the prosecutor's race-neutral reasons for striking the four black jurors, nor did the trial court make any findings regarding whether the prosecutor's stated reasons were pretextual." (*Ibid*.) As the Supreme Court described, "[i]n other words . . . the trial court 'full-stop ended its *Batson* analysis' at step two and never proceeded to step three." (*Ibid*.)

The United States Supreme Court detailed how, on such a record, no third stage finding was made. "After a prosecutor asserts race-neutral reasons for a peremptory strike, the defense counsel must at least have an opportunity to argue that the asserted race-neutral reasons were not the actual reasons — that is, the reasons were pretextual. Then, the trial court can determine whether those asserted reasons were the actual reasons or instead were pretextual." (*Pitchford, supra*, ____ U.S. at p. ___ [146 S.Ct. at p. 1353].) "In this case, whether due to confusion, oversight, an overly hurried jury selection process, or some other cause, things broke down, and the ordinary trial-court procedure for resolving *Batson* claims *at step three never occurred*." (*Ibid*., italics added.)

Comparing the record in *Pitchford* and this case reveals that the purported "stage three" findings in both cases are virtually indistinguishable. In both cases, the trial court (1) engaged in no analysis of the justifications, (2) noted that the reasons provided by the prosecutor were "race-neutral," and (3) denied the motion without providing the defendant any opportunity to contest the prosecutor's reasons as pretextual.

The majority attempts to distinguish *Pitchford* on two bases. First, it suggests that the high court's holding was directed solely at Mississippi's argument that Pitchford had waived his *Batson* claim and is thus "inapplicable . . . because waiver is not at issue here." (Maj. opn., *ante*, at p. 71, fn. 15.) This statement is an incorrect articulation of the high court's holding regarding what constitutes clearly established federal law under *Batson*.

As the *Pitchford* opinion itself notes, under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA; Pub.L. No. 104-132 (Apr. 24, 1996) 110 Stat. 1214), the "standard for reviewing claims on federal habeas is deferential to the state court." (*Pitchford*, *supra*, ____ U.S. at p. ___ [146 S.Ct. at p. 1353]; *id.* at p. ___ [146 S.Ct. at p. 1351] ["To obtain federal habeas relief under [AEDPA], Pitchford was required to clear a high bar — namely, to establish that the Mississippi Supreme Court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' "], citing 28 U.S.C. §§ 2254(d)(1), (2).)

The high court was able to grant relief in *Pitchford,* despite these deferential requirements, because it found that the *Batson* procedure had never been properly completed. (See *Pitchford*, *supra*, ____ U.S. at p. ___ [146 S.Ct. at p. 1353] ["we agree with the U. S. District Court that the Mississippi Supreme Court *unreasonably applied the clearly established Batson* precedents *and* unreasonably determined that Pitchford waived his opportunity to rebut the prosecutor's asserted race-neutral reasons for the peremptory strikes of four black prospective

jurors" (italics added)].) In slightly different, but similarly conjunctive phrasing, the United States District Court, with which the high court explicitly "agree[d]" (*ibid*.) "concluded that the Mississippi Supreme Court had unreasonably applied *Batson and* had unreasonably determined that Pitchford waived his *Batson* objection" (*id*. at p. ___, italics added [146 S.Ct. at p. 1351]). (See also *id*. at p. ___ [146 S.Ct. at p. 1347] [the District Court "explained that no state court had conducted the full three-step *Batson* inquiry, *and* that the trial court had 'thwarted' the 'attempt by Pitchford's counsel to argue pretext.'" (italics added)].) The high court specifically concurred in the District Court's conclusions regarding the deficient *Batson* process. (*Id*. at p. ___ [146 S.Ct. at p. 1353] ["the ordinary trial-court procedure for resolving *Batson* claims at step three never occurred"]; *id*. at p. ___, fn. 3 [146 S.Ct. at p. 1352, fn. 3] ["the more fundamental point here is that the Mississippi trial court prevented Pitchford's counsel from pursuing a *Batson* argument at step three"].)

To offer, as the majority does, that *Pitchford*'s holding is limited to waiver ignores the high court's holding that the state courts were not only wrong, but objectively unreasonable, in their assessment of clearly established *Batson* precedent in determining that the *Batson* procedure had been properly followed. (See *White v. Woodall* (2014) 572 U.S. 415, 419 [under AEDPA, an unreasonable application of Supreme Court holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice].)

Accepting that the high court's opinion could "be read as commenting on a trial court's duties at the third stage of the *Batson/Wheeler* inquiry" (maj. opn., *ante*, at p. 71, fn. 15), the majority also attempts to distinguish *Pitchford* on the facts. It

claims that in *Pitchford*, unlike in this case, after denying the motion, "the trial court launched into other court business" whereas in Shove's case "the defense remained resolutely silent" in the face of the trial court's ruling. (*Ibid.*) But with respect to the *Batson* ruling, the trial court statements in these two cases are virtually identical. In *Pitchford*, the trial court stated, "The Court finds that to be race neutral as well. So now we will go back and have the defense starting at [a peremptory challenge for prospective juror] 37." Here, the trial court stated, "And I do believe that the reasons that have been indicated for the African/American jurors that have been excused are race-neutral reasons, and I am denying the *Wheeler* motion at this time" followed by, "All right, the peremptory is with the defense." In other words, in both *Pitchford* and here, the trial court "launched into other court business" — indeed, the exact same business, the continued exercise of defense peremptories. And, just as in *Pitchford*, defense counsel made no effort during the *Batson* hearing to renew the objection or continue arguing after the trial court had ruled.[2]

The majority also contends that the cases are distinct because "there is no indication that the trial court in any way ' "thwarted" ' or 'prevented' counsel from raising any such concerns." (Maj. opn., *ante*, at p. 72, fn. 15.) In support of this claimed distinction, it notes that, in *Pitchford*, after being convicted and sentenced to death, the defendant filed a motion

---

[2]    That defense counsel did not attempt to rebut the prosecution's justifications  (maj. opn., *ante*, at p. 71, fn. 15) is understandable and hardly surprising. The trial court had just denied the motion, finding no prima facie case. Immediately after denying the motion, as in *Pitchford*, the trial court "launched into other court business." (*Ibid.*)

for a new trial where, among numerous other claims, he
" 'advance[ed] the argument that he was prevented from making
during jury selection — that the prosecutor's stated reasons for
the peremptory challenges were pretextual.' " (*Ibid*.) The
majority's citation merely proves the contrary point. The high
court's conclusion that Pitchford was "prevented" from making
an argument did not depend on the motion for new trial or
statements made by the trial court in that context. Like Shove,
Pitchford was "prevented" from making a full *Batson* claim
"*during jury selection*" (*ibid*., italics added). This is because in
both cases, the trial court abruptly and deficiently ruled that the
reasons were "race neutral" and then immediately pivoted to
subsequent peremptories, without giving any time for defense
input on the matter.[3]

There is one meaningful distinction between this case and
*Pitchford*. In this case, unlike in *Pitchford*, the trial court had
first articulated a succinct ruling that there was no prima facie
case. But the existence of this first stage ruling provides even
*less* reason than in *Pitchford* to conclude that the trial court
conducted a third stage finding since it would have been
unnecessary to do so. In other words, the trial court had no need

---

[3] In *Pitchford*, counsel also renewed the *Batson* objection at
the close of jury selection. But nothing therein distinguishes
*Pitchford* from this case. The ruling at the close of jury selection
in *Pitchford* merely reiterated, and rested upon, the trial court's
prior ruling that the reasons were "race neutral." (See
*Pitchford, supra,* ____ U.S. at p. ___ [146 S.Ct. at p. 1350] [trial
court's ruling: " 'I think you already made those, and they are
clear in the record. For the reasons previously stated, first the
Court finds there to be no — well, all the reasons were race
neutral as to members that were struck by the district attorney's
office. And so the, the Court finds there to be
no *Batson* violation' "].)

to make a third stage finding, because it had already made a dispositive first stage finding.  Moreover, the trial court's failure to notice that the prosecution provided no justification at all for one of the challenged jurors strongly signals that the trial court did not intend to resolve the third stage when it remarked that the prosecutor's reasons were "race-neutral."  If the trial court had actually aimed to make an alternative finding of a third stage denial for all jurors, it seems unlikely that it would have overlooked the prosecution's failure to justify the removal of one of the jurors.

It is true that our precedent has allowed "the term 'race neutral' as a shorthand for the conclusion that the striking party's actual reasons for striking the juror were not racially discriminatory."  (Maj. opn., *ante*, at p. 72, fn. 15.)  However, *Pitchford* calls into question the propriety of any blanket assumption that a trial court's statement that a prosecutor's reasons are "race neutral" necessarily suggests that it has completed the third step and has found the reasons credible.  Instead, *Pitchford* finds a violation of clearly established *Batson* law on facts that are materially indistinguishable from the case at hand.

Notwithstanding the trial court's finding of no prima facie case, as the majority correctly holds, the procedural facts of this case and our decision in *Scott* mandate that we nonetheless "infer" a prima facie finding and move to stage three.  (Maj. opn., *ante*, at p. 56; *Scott, supra,* 61 Cal.4th at p. 387, fn. 1.)  At this point, the only possible solutions are a limited remand to allow the trial court to actually complete the third stage review, or a determination of whether completion of this process is feasible in light of the significant passage of time.  (*People v. Johnson* (2006) 38 Cal.4th 1096, 1101–1104; *People v. Snow* (1987) 44

14

Cal.3d 216, 227 (*Snow*) [in light of six-year delay, finding remand infeasible].)[4]

### III.   PROSPECTIVE JUROR NO. 206

As discussed above, the prosecutor here never provided any justification for her exclusion of Prospective Juror No. 206. The majority circumvents this inadequacy in the record by reviewing Prospective Juror No. 206 at the prima facie stage. But the prosecutor's failure to explain why she excluded this prospective juror does not provide a reason to create a new exception to our practice of implying a prima facie finding when the prosecutor's justifications precede the trial court's ruling of no prima facie case.  (*Scott*, *supra*, 61 Cal.4th at p. 387, fn. 1.)

The majority reasons that the trial court's purported third stage ruling "could not have addressed reasons related to Prospective Juror No. 206" and therefore decides to "review the court's denial of Shove's *Batson/Wheeler* motion as to Prospective Juror No. 206 as a first-stage denial" while

---

[4]     As in *Snow*, there are significant reasons to doubt, after the passage of nearly 20 years, that the judge could accurately assess the prosecutor's reasons for any juror.  Such an effort would demand that the trial court " 'recall the circumstances of the case, and the manner in which the prosecutor examined the venire and exercised h[er] other challenges.' " (*Snow*, *supra*, 44 Cal.3d at p. 227.)  Although it is a somewhat closer question for the jurors for whom justifications were contemporaneously provided, with respect to Juror No. 206, for whom no justification was provided, a limited remand would be infeasible. (Cf. *Snyder v. Louisiana* (2008) 552 U.S. 472, 486, [no "realistic possibility" that the question of whether discriminatory intent was the determinative cause of the disputed strike "could be profitably explored further on remand at this late date, more than a decade after petitioner's trial"].)

"proceed[ing] directly to the third stage of the analysis" for the other prospective jurors at issue. (Maj. opn., *ante*, at pp. 59, 58.) The problem with this approach is that, based on the record, it appears that the trial court's third stage ruling, assuming one occurred, intended to address all targeted jurors despite the fact the prosecution never actually addressed one of the strikes. The most obvious reading of the record is that the trial court failed to pay sufficient attention, not that it somehow excepted one of the jurors from its purported third stage finding.

The absence of any justification for striking Prospective Juror No. 206 does not compel an exception to *Scott*'s footnote 1. To be sure, the trial court's ruling on a prima facie case would not have been affected by justifications provided *for Prospective Juror No. 206*, since none were provided. However, since all jurors were considered and ruled upon together, it is impossible to know whether the justifications that *were* provided improperly influenced the trial court's prima facie finding. Indeed, an improper influence appears highly likely. The trial court undeniably "listen[ed] to" the prosecutor's justifications prior to making a finding of no prima facie case. (*Krebs, supra*, 8 Cal.5th at p. 290.) Moreover, in the very same sentence, it also concluded that all four of the reasons were "race-neutral" and, at least in the majority's view, genuine. It is difficult to imagine that the trial court's finding that all jurors for whom justifications were given had been validly stricken would not influence its assessment of the overall pattern of strikes here.

To support its bifurcated analysis, the majority cites our decision in *People v. Montes* (2014) 58 Cal.4th 809, 852 (*Montes*), where we analyzed some prospective jurors at stage three and another prospective juror at stage one. (Maj. opn., *ante*, at p. 59.) Although *Montes* likewise involved a prospective juror for

whom no justification was given, *Montes* provides no support for the majority's holding. *Montes* was a pre-*Scott* decision and thus could not have addressed the rule we first adopted in *Scott*. In the *Montes* decision, the prosecutor stated his reasons for the exclusion for one (of two) prospective jurors only *after* "the trial court appeared to rule a prima facie case had not been made" as to these two jurors. (*Montes*, at p. 853.) Thus, although the *Montes* opinion found that appellate review of the prima facie case was permissible for some jurors, including the juror for whom no reason was given, but not others (*id.* at pp. 853–855), it did so where the trial court's prima facie finding for those jurors was wholly independent of the reasons given by the prosecutor. Therefore, *Montes* does not suggest an exception to the rule we announced in *Scott*: that when the prosecutor provides her reasons prior to the finding of no prima facie case that we nonetheless "infer" a prima facie finding and move to *Batson*/*Wheeler*'s third stage. (*Scott, supra,* 61 Cal.4th at p. 387, fn. 1.)

*Montes* also addressed a situation in which the trial court itself treated the prima facie case for prospective jurors differently, demanding justifications only for some prospective jurors, but appearing to find no prima facie case as to others. (*Montes, supra*, 58 Cal.4th at p. 853.) Thus, there was logic in our parallel review of the trial court's decision: analyzing distinctly different groups of jurors which the trial court itself had analyzed separately. But here, the trial court treated all jurors the same — with a single prima facie finding. It seems peculiar that we should nonetheless analyze these prospective

jurors at different stages of the *Batson/Wheeler* process.[5] Rather than being compelled by our precedent, the majority's creation of a new exception for a rule intended to be "clear, predictable, and easy to apply" (*Scott, supra,* 61 Cal.4th at p. 389), seems to be driven by the absence of any justification under which we could uphold the trial court's ruling at stage three with respect to a juror for whom no reason was ever provided. Perhaps such an explanation exists. But given *Scott*'s requirement that we proceed to stage three in this circumstance, such an explanation must be provided and ruled upon for the strike to be upheld. Since this was never done for Prospective Juror No. 206, and because a limited remand after nearly two decades is infeasible, affirming the trial court's ruling in this case is unwarranted.

---

[5] The majority supports its approach by offering that it is "unlikely" that "when the trial court went on to rule on the prosecutor's reasons at the third stage, it intended to rule on reasons the prosecutor had never, in fact, proffered." (Maj opn., *ante*, at p. 59, fn. 12.) But there is no hint in the record that the trial court intended to apply its global third stage ruling only to some jurors and not others. Instead, the prosecutor forgot to provide a reason for one of the jurors and the defense failed to point out the deficiency to the trial court. It is unreasonable to assume that the trial court recognized the parties' failures and implicitly altered its ruling from the normal course. The court ruled on all jurors with a single statement — without saying anything to indicate it was differentiating between any of the jurors. Instead, the most reasonable conclusion is that the trial court, like the parties, failed to notice that no reason was provided for striking Juror No. 206.

For the reasons articulated above, I would reverse the judgment in its entirety.  I therefore respectfully dissent.

**EVANS, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Shove

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S161909
**Date Filed:** August 13, 2026

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Kathleen A. Kennedy

_____

**Counsel:**

Mary K. McComb, State Public Defender, Kathleen M. Scheidel, Assistant State Public Defender, and Alyssa Mellott, Deputy State Public Defender, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, James William Bilderback II, Assistant Attorney General, Joseph Lee and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alyssa Mellott
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA 94607
(510) 267-3300

Blythe J. Leszkay
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6191